2016 IL App (1st) 161589

SIXTH DIVISION
Opinion filed: November 4, 2016

Nos. 1-16-1589 and 1-16-1727 (Consolidated)

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| In re: H.S., a Minor, | ) | Appeal from the |
| | ) | Circuit Court of |
| Respondent-Appellant, | ) | Cook County |
| | ) | |
| (THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No.   12 JA 158 |
| | ) | |
| SOLEIL S. and JULIO R., | ) | Honorable |
| | ) | Nicholas Geanopoulos, |
| Respondents-Appellants). | ) | Judge, Presiding. |
| | | |
| In re: E.S., a Minor, | ) | Appeal from the |
| | ) | Circuit Court of |
| Respondent-Appellant, | ) | Cook County |
| | ) | |
| (THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | No.   12 JA 159 |
| v. | ) | |
| | ) | |
| SOLEIL S., | ) | Honorable |
| | ) | Nicholas Geanopoulos, |
| Respondent-Appellant). | ) | Judge, Presiding. |

PRESIDING JUSTICE HOFFMAN delivered the judgment of the court, with opinion. Justices Cunningham and Rochford concurred in the judgment and opinion.

**OPINION**

¶ 1 The respondent-appellant, Soleil S. (S.S.) appeals from the orders of the circuit court terminating her parental rights as to the minors-respondents-appellees, H.S. and E.S. (No. 1-16-1589), arguing that the record does not demonstrate compliance with the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 *et seq.* (2012)) and, as a consequence, the orders affecting H.S. and E.S. must be reversed. The respondent-appellant, Julio R. (J.R.) filed a separate appeal (No. 1-16-1727) from the order of the circuit court terminating his parental rights as to the minor-respondent-appellee, H.S., arguing that the factual findings supporting the circuit court's order of parental unfitness and the best interest of H.S. are against the manifest weight of the evidence. This court consolidated the appeals. For the reasons which follow, we: (1) find that the court's determination of J.R.'s parental unfitness as to H.S. and its finding that it is in her best interest to terminate his parental rights are not against the manifest weight of the evidence; (2) vacate the circuit court's order terminating the parental rights of S.S. and J.R. as to H.S.; (3) vacate the circuit court's order terminating the parental rights of S.S. as to E.S; and (3) remand the matter back to the circuit court with directions to make a factual determination as to whether H.S. and E.S. are, or are not, Indian children within the meaning of the ICWA and, after the determination is made, for further proceedings consistent with this opinion.

¶ 2 On February 9, 2012, the State filed petitions for adjudication of wardship and motions for temporary custody of H.S., born May 5, 2011, and E.S., born March 2, 2010. S.S. is the mother of both H.S. and E.S., and J.R. is the father of H.S. The petitions alleged that both children were abused and neglected by reason of having been left alone in their home where illegal drugs and drug paraphernalia were present, an injurious environment, and a lack of due

care.  During the course of the temporary custody hearing held that same day, the court inquired as to whether S.S., or any member of her immediate family, was of Indian or Native American descent.  S.S. told the court that she was descended from the "Cherokee, Creek, Blackfoot, Choctaw and Pawnee" tribes.   Following the hearing, the circuit court took temporary custody of both children from S.S.  And on February 15, 2012, following a temporary custody hearing, the court took temporary custody of H.S. from J.R.

¶ 3      On September 5, 2012, the circuit court held a hearing, during which it was stipulated that, if called, witnesses would testify that a Chicago police officer arrived at the family home on February 6, 2012, and found the front door broken and open.  H.S. and E.S. were found alone in the home which was in a state of disarray.  When S.S. arrived at the home, she told the police officer that J.R. had kicked the door down.  She also told the officer that there was a history of violence between herself and J.R and provided copies of the police reports from previous incidents.  On February 7, 2010, an investigator from the Department of Children and Family Services (DCFS) visited the home and observed the children in soiled clothing and diapers.  She also observed that the front door to the home was still broken and the lights were not working.  In addition, the investigator detected a strong odor of urine and feces in the home and saw empty drug bags and two marijuana cigarettes.  S.S. admitted to using marijuana and crack cocaine.  J.R. admitted that he had used marijuana in the presence of the children and told the investigator that the marijuana in the home was his.  He also admitted to having kicked down the front door.  S.S. admitted that she had been hospitalized for psychiatric issues.  She also admitted leaving the children home alone.  Following the hearing, the circuit court entered adjudication orders, finding that H.S. and E.S were neglected due to lack of care, an injurious environment, and being left without supervision for an unreasonable period of time.

¶ 4     On October 31, 2012, the circuit court entered dispositional orders, finding that S.S. and J.R. were unable to care for H.S. and E.S., and adjudicating the children wards of the State. The DCFS Guardianship Administrator was appointed as the guardian of both children, and the court set a permanency goal of returning the children home in 12 months.

¶ 5     On March 25, 2013, a permanency planning hearing was held, during which the court heard evidence that S.S. had tested positive for marijuana at every drug drop since the dispositional hearing of October 31, 2012. The court was also advised that J.R failed to tell the DCFS case worker that S.S. was living with him and that she was present when he visited with H.S. Following that hearing, the court found that S.S. had not made substantial progress toward the permanency goal and entered a new permanency goal of returning both children home in 12 months.

¶ 6     The circuit court conducted another permanency hearing on November 2, 2013. The court heard testimony that J.R. had not completed parent coaching and family therapy classes, and that he was unwilling or unable to parent H.S. without S.S. The court found that neither S.S. nor J.R. had made substantial progress toward the previous permanency goal and again set a goal of returning the children home in 12 months.

¶ 7     During a permanency hearing held on January 5, 2014, the court heard testimony that S.S. failed to comply with the services offered to her, that she continued to abuse drugs, and that her relationship with J.R. continued to be plagued by domestic violence. Following that hearing, the goal for E.S. was changed to substitute care pending a determination on termination of parental rights.

¶ 8     Following a permanency hearing on April 4, 2014, the court found that neither S.S. nor J.R. was making substantial progress toward the goal of returning H.S. home, and the court again

set a permanency goal of returning H.S. home in 12 months. In addition, the court found that S.S. had failed to make progress in any of the recommended services, including therapy, psychiatric care, and substance abuse treatment.

¶ 9    When the case was heard on January 5, 2015, the court was advised that S.S. was non-compliant with the services she had been offered. Following that hearing, the goal for H.S. was also changed to substitute care pending a determination on termination of parental rights.

¶ 10    On July 8, 2015, the State filed supplemental petitions seeking to permanently terminate the parental rights of S.S. as to both H.S. and ES. and J.R.'s parental rights as to H.S. The State also sought the appointment of guardians with the right to consent to the adoptions of both children. The petitions alleged that S.S. and J.R. were unfit based upon their failure to maintain a reasonable degree of interest, concern and responsibility for the children's welfare (ground (b)) (see 750 ILCS 50/1(D)(b) (West 2014)), and their failure to make reasonable efforts to correct the conditions which were the basis for the children's removal and to make reasonable progress towards the children's return home within the immediately preceding nine months, or within a nine month period after the adjudication of neglect or abuse (ground (m)) (see 750 ILCS 50/1(D)(m) (West 2014)).

¶ 11    During the course of a hearing on October 1, 2015, the State introduced into evidence certified mail receipts for notices of the pendency of the instant proceedings that were sent to the United Keetoowa Band of Cherokee Indians and the Bureau of Indian Affairs, in North Carolina, Minnesota and Washington D.C. The State also introduced the responses it received from three tribes; namely, the Cherokee Nation, the United Keetoowa Band of Cherokee Indians, and the Eastern Band of Cherokee Indians. The State did not introduce copies of the notices it had sent. Following that hearing, the circuit court entered an order finding that the ICWA did not apply to

the proceedings "based upon the notices and reports received from the various Indian tribes that were part of the record today." The court made no finding as to whether H.S or E.S are Indian children within the meaning of the ICWA.

¶ 12    On March 16, 2016, the State gave notice that they were pleading the following nine-month periods pursuant to ground (m) for both S.S. and J.R.:  September 6, 2012, to June 6, 2013; June 7, 2013, to March 7, 2014; and March 9, 2014, to December 8, 2014.

¶ 13    On April 27, 2016, a fitness hearing commenced.   Testifying for the State was Sulma Garcia-Mora, the DCFS case worker assigned the cases of H.S. and E.S. from February 2014 to February 2015.  Garcia-Mora testified that, when she took over the cases, S.S. was in need of individual therapy, medication monitoring, and psychiatric services.  She also recommended parent coaching due to the argumentative behavior of both S.S. and J.R.  She stated that, although S.S. had participated in substance abuse services, she relapsed after treatment.  In addition, S.S. did not successfully complete individual therapy, did not engage in medication monitoring, and was not taking her prescribed psychotropic medication.  According to Garcia-Mora, S.S. and J.R. were discharged unsuccessfully from couple's therapy because of irreconcilable difference between them.  She testified that J.R. was in need of parenting coaching, but only attended two sessions.  Although J.R. told her that S.S. was no longer living with him in the summer of 2014, the presence of S.S.'s clothing in the home led Garcia-Mora to believe that S.S. was still residing there.  She testified that, in August 2014, J.R. admitted that he was still in a relationship with S.S.  Garcia-Mora testified that, by February 2015, J.R. and S.S. were not living together, and that S.S. was in another relationship and pregnant.  On cross examination, Garcia-Mora admitted that all of J.R.'s urine drops were negative.  She also testified that she never witnessed any inappropriate conduct on the part of J.R when he was with

the children, but maintained that he was not making substantial progress toward the goal of returning the children home.

¶ 14     Megan Burgess-Garcia, the DCFS caseworker assigned to the cases of H.S and E.S from February 2012 until January 2013, and from June 2013 until January 2014, also testified as a witness for the State.  Burgess-Garcia stated that, in 2012, she assessed S.S. as being in need of individual therapy, psychiatric services, domestic violence classes, substance abuse treatment, parenting coaching, and couple's therapy.  S.S. was referred for individual therapy three times from August 2013 through November 2013 and was unsuccessfully discharged each time.  On one occasion, she failed to follow up with the therapist, and on the last referral, she was discharged for failing to address her substance abuse.  In addition, S.S. was inconsistent in taking and monitoring her psychotropic medication.  Although S.S. completed substance abuse services, she relapsed after finishing the outpatient program.  According to Burgess-Garcia, S.S. was still in need of substance abuse treatment.  S.S. started, but never finished, domestic violence classes, classes which Burgess-Garcia testified that S.S. needed because of the violence present in her relationship with J.R. Burgess-Garcia also referred S.S. and J.R. to parenting coaching services, but those services were suspended when they began arguing during the intake session.  Burgess-Garcia stated that S.S. admitted to being physically violent toward J.R., and J.R. admitted to being verbally abusive toward S.S.  According to Burgess-Garcia, S.S maintained contact with J.R. as late as June 2015 and that their relationship was marred by domestic violence.  Burgess-Garcia stated that, in September 2012, S.S. was arrested for a domestic violence incident in which J.R. was the victim.  She was never able to recommend that S.S. be given unsupervised visitation rights with the children due to the ongoing conflict between her and J.R and because she never completed any of the recommended services.  Burgess-Garcia testified that she

assessed J.R as being in need of substance abuse treatment, domestic violence classes, parenting coaching and couple's therapy. She acknowledged that J.R successfully participated in therapy, domestic violence classes, and substance abuse services, but stated he never completed parenting coaching or couples therapy due to the conflict between himself and S.S. She testified that, in March 2012, J.R. threatened S.S. with a knife at the children's foster home. It was Burgess-Garcia's opinion that J.R. would not be able to care for H.S as a sole parent. She found him disengaged at times, and stated that, although J.R. was consistent in his supervised visitation with H.S., he took no initiative toward being allowed unsupervised visitation and never even requested unsupervised visitation until September 2013. On cross-examination, Burgess-Garcia testified that, to the best of her knowledge, J.R. was working and stable. She also admitted that she never heard J.R. say anything inappropriate to the children, and that, at the time of her last visit to J.R.'s home, she did not observe anything that would be injurious to the children. Following the testimony of the DCFS case workers, the State rested and the hearing was continued.

¶ 15    When the fitness hearing resumed on May 12, 2016, J.R. testified on his own behalf. He stated that he had been employed as a handyman for 15 years and was living in a two-bedroom home. J.R. testified that he successfully completed a substance-abuse program and had been drug free for four years. According to J.R., S.S. left his home in 2015, and he has had no consistent contact with her for over a year. He stated that, although the children were left alone in 2012, he was at work at the time and had never left the children alone. On cross examination, J.R. admitted that he speaks to S.S. on the phone four or five times a month and last saw her in April 2016. He testified that he sees S.S. about once each month at her apartment.

¶ 16    Following the close of evidence and the conclusion of the parties' arguments, the court adjudged S.S. unfit as to both H.S. and E.S. and J.R. unfit as to H.S.  The court found that the State had proven both grounds (m) and (b) by clear and convincing evidence.  In its oral pronouncements, the court recounted that, within the three time frames pled by the State, S.S. never successfully completed the services recommended for her and never progressed to a point where she could have unsupervised visitation.  As to J.R., the court stated that he failed to recognize S.S.'s issues of drug abuse and mental health which posed a risk to the children; demonstrated a lack of understanding of the effect upon H.S. that his ongoing contact with S.S. had; that the violent relationship between he and S.S. showed his inability to keep the children, specifically H.S., safe; and that he would never be able to parent separately.   In addition, the court stated that S.S. and J.R. failed to maintain a reasonable degree of responsibility towards the children's welfare.  The court found that the evidence established that S.S and J.R. failed to take responsibility for the conditions which brought the children into the court system and failed to make reasonable efforts to correct the conditions which required the children to be removed from their home.

¶ 17    Immediately following the conclusion of the fitness hearing, the circuit court commenced a best-interest hearing.  For its first witness, the State called Venita Allen, the foster parent of both H.S and E.S.  She testified that the children have lived with her since May of 2012.  According to Allen, H.S. and E.S. share a room, but have their own beds.  Also living in the home are two other foster children and Allen's biological daughter.  Allen stated that they have a good relationship and engage in family activities together such as going to the movies, skating, and bowling.   Allen reported that E.S is in first grade and going to therapy sessions, but does not receive any services at school.   Allen stated that H.S. is enrolled in a head start program.

According to Allen, H.S. has exhibited defiant and aggressive behavior. In addition, H.S was diagnosed with ADHD in October 2015 and receives play therapy and takes medication. She also stated that S.S. has been attempting to secure a "504 plan" or an individualized education plan for H.S. Allen testified that she desired to adopt both children and stated that she would allow S.S. and J.R. to visit with them, as the children still love S.S. and J.R. When cross examined, Allen testified that she was unaware that the children were Catholic and admitted that she never took them to a Catholic church. According to Allen, she is a Jehovah Witness and takes the children to Kingdom Hall for services.

¶ 18 The State again called Burgess-Garcia as a witness. She testified that the children were placed in a foster home in May of 2012. She stated that the foster home is safe and appropriate and poses no risk of harm to the children. The home is not a Spanish speaking home and they do not converse in Spanish, but someone living in the home speaks fluent Spanish. Burgess-Garcia told the court that H.S. is enrolled in a head start program and that she has been diagnosed with ADHD. According to Burgess-Garcia, H.S. has behavioral issues and is seeing a psychiatrist. She testified that Allen takes the children to all of their service appointments. She stated that E.S. told her that she does not like living in the foster home because she does not get along with the other children. When Burgess-Garcia spoke to E.S.'s therapist, she was told that E.S. related that she disliked her foster home because she is required to eat healthy food and go to bed at a set time. She stated that H.S told her that she likes living in the foster home. Although the children appear to be bonded with J.R., Burgess-Garcia stated that they view their foster home as their primary home and have developed a primary attachment to their foster parent. She testified that H.S. and E.S. are attached and bonded to Allen who is patient with the children. Burgess-Garcia was of the opinion that Allen can safely manage all of the children's needs. She testified that it is

in the best interest of the children that they remain together, and she did not believe there was any way that both children would be placed with J.R. Burgess-Garcia advised the court that it is the recommendation of DCFS that the parental rights of S.S. and J.R. be terminated and that H.S. and E.S. be adopted by Allen.

¶ 19    Following the best interest hearing, the court entered a separate written termination order for each of the children. As to H.S., the court involuntarily terminated the parental rights of both S.S. and J.R. based upon its finding of parental unfitness under both ground (b) and ground (m) and the best interest of the child. In addition, the court found that the best interest of H.S. required the appointment of a guardian with the right to consent to her adoption. As to E.S., the court entered an order of default against Lamont Ross, her putative father, and all other unknown individuals, and found him unfit by reason of: abandonment; failing to maintain interest, concern or responsibility; desertion; "fail[ing] to make reasonable efforts/progress;" and intent to forego parental rights. The court involuntarily terminated the parental rights of both S.S. and the putative father as to E.S. based upon its finding of parental unfitness and the best interest of the child. The court also found that the best interest of E.S. required the appointment of a guardian with the right to consent to her adoption.

¶ 20    Both S.S. and J.R. filed timely notices of appeal. We will first address J.R's appeal.

¶ 21    In urging reversal of the circuit court's order of May 12, 2016, in the matter of H.S., J.R. argues that the circuit court's finding of his parental unfitness under both statutory grounds alleged by the State is against the manifest weight of the evidence as is its finding that it is in the best interest of H.S. that his parental rights be terminated and a guardian appointed with the right to consent to the child's adoption.

¶ 22    J.R. asserts that the evidence presented at the fitness hearing established that he completed a substance abuse program and has remained drug free for four years. He points to the fact that his drug drops were negative, as attested to by Garcia-Mora, the DCFS case worker assigned to H.S.'s case. He argues that the evidence demonstrated that he successfully completed domestic-violence programs and was consistent in his visitation with H.S. J.R. contends that there was no evidence that he maintained his relationship with S.S.; rather, he moved out of their shared residence and obtained his own home. According to J.R., these facts support his contention that the circuit court's finding of his parental unfitness is against the manifest weight of the evidence. Although a number of J.R.'s factual assertions are true, they paint a very limited picture of his efforts toward reunification following the removal of H.S. from his home.

¶ 23    Parental rights may be involuntarily terminated where the State proves, by clear and convincing evidence, that a parent is unfit under one of the grounds set forth in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2014)) and the circuit court finds that termination is in the child's best interest. *In re M.R.*, 393 Ill. App. 3d 609, 613 (2009). Any single ground, if proven, is sufficient for a finding of unfitness. *In re D.F.*, 201 Ill. 2d 476, 495 (2002). We will only reverse a circuit court's finding of unfitness when it is against the manifest weight of the evidence; that is to say, when an opposite conclusion is clearly evident. *In re Deandre D.*, 405 Ill. App. 3d 945, 952 (2010). And, we will not substitute our judgment for that of the circuit court on the issues of witness credibility, the weight to be accorded the evidence, or the inferences to be drawn from that evidence. *In re D.F.*, 201 Ill. 2d at 499.

¶ 24    Section 1(D)(m) of the Adoption Act contains separate grounds, either of which can support a finding of parental unfitness; namely, a parent's failure to make "reasonable efforts" to correct the conditions that were the basis for the removal of the child, and a parent's failure to

make "reasonable progress" toward the return of the child. 750 ILCS 50/1(D)(m)(i), (ii) (West 2014).

¶ 25    In its written order of May 12, 2016, relating to H.S., the circuit court found J.R. unfit pursuant to section 1(D)(m) "on the following specific ground: *** (m) failed to make reasonable efforts/progress." In his brief on appeal, J.R. has interpreted the circuit court's shorthand to mean that he was adjudicated unfit both for failing to make "reasonable efforts" to correct the conditions that were the basis for H.S's removal, and for failing to make "reasonable progress" toward the return of H.S. We believe that the evidence presented to the circuit court supports both grounds.

¶ 26    On September 5, 2012, H.S. was adjudicated a neglected child by reason of an injurious environment in addition to other grounds. The evidence established that S.S. was, throughout the pendency of these proceedings, a drug abuser, that she failed to take or monitor the psychotropic medication she was prescribed, and that she failed to satisfactorily complete the services offered to her. Nevertheless, J.R. maintained a relationship with S.S., a relationship marred by domestic violence, and he continued to reside with her from the commencement of these proceedings in February 2012 until February 2015. After J.R. no longer resided with S.S., he continued to see her on a monthly basis. Clearly, S.S. posed a risk to both H.S. and her sister E.S., and so long as J.R. continued to reside with her, the injurious environment which led to the children's removal continued unabated.

¶ 27    Reasonable progress toward the return of the child is judged on an objective standard that focuses on the steps the parent has taken toward reunification. *In re D.F.*, 332 Ill. App. 3d 112, 125 (2002). At minimum, the parent must make demonstrable movement toward the goal of returning the child home. *Id.*

¶ 28    Whether a parent has made reasonable efforts to correct the conditions that were the basis for the child's removal is judged on a subjective review of the parent's achievements.  *Id.* The court must assess whether the parent has made "earnest and conscientious strides" toward correcting the conditions which led to the child's removal.  *Id.* (quoting *In re B.S.,* 317 Ill. App. 3d 650, 658 (2000)).

¶ 29    One of the grounds for H.S's removal was that she was living in an environment which was injurious to her welfare.  The factual underpinnings of this ground included S.S.'s admission to using illegal drugs, that fact that she suffered from anxiety and depression and was non-compliant with her psychiatric medication, and the admissions of S.S. and J.R. that they had a history of domestic violence in the presence of the children.   The evidence established that S.S. continued as a drug abuser, was non-compliant with her psychiatric medication, and did not satisfactorily complete any of the services recommended for her.  Nevertheless, J.R. continued to reside with S.S for more than three years after H.S. was removed from his custody. Maintenance of a residence with an individual who obviously posed a danger to H.S. for over three years during the pendency of the case was hardly a demonstrable movement toward reunification.  Nor could it be termed an earnest and conscientious stride toward correcting the injurious environment which led to the H.S's removal originally.

¶ 30    Based upon the evidence before it, the circuit court found that the State proved, by clear and convincing evidence, that J.R. is unfit under the grounds set forth in section 1(D)(m) of the Adoption Act.   And based upon the record before us, we cannot conclude that the circuit court's finding in this regard is against the manifest weight of the evidence.

¶ 31     Because a finding of parental unfitness may be based upon evidence sufficient to support one statutory ground, we need not address the issue of whether the State met its burden of proving J.R. unfit under section 1(D)(b) of the Adoption Act.

¶ 32     Although a parent may be unfit to have custody of his child, it does not necessarily follow that it is in the child's best interest that his parental rights be terminated. *In re M.F.*, 326 Ill. App. 3d 1110, 1115 (2002).  After a finding of unfitness, the circuit court must still give full and serious consideration as to whether it is in the child's best interest to terminate parental rights, as the termination of parental rights permanently and completely severs the parent-child relationship.  750 ILCS 50/17 (West 2014).  A circuit court's finding that the termination of parental rights is in the best interest of the child will not be disturbed on appeal unless it is contrary to the manifest weight of the evidence.  *In re M.F.*, 326 Ill. App. 3d at 1115-16.  In this case, we do not believe that the circuit court's finding that it is in the best interest of H.S. to terminate J.R.'s parental rights is against the manifest weight of the evidence.

¶ 33     At the time of the best-interest hearing, the circuit court was aware that J.R. had successfully gone through a substance abuse program and had been drug free for four years.  The court also heard testimony that he had successfully completed domestic violence classes. Burges-Garcia testified that J.R. was working and stable, that she never heard J.R. say anything inappropriate to either H.S. or E.S., and that, at the time of her last visit, she did not observe anything in J.R.'s home that would be injurious to H.S.   Garcia-Mora acknowledged that she never witnessed any inappropriate conduct on the part of J.R. when he was with H.S.  By the time of the hearing, J.R. was no longer living with S.S. and was living alone in a 2-bedroom apartment.  All of these facts standing alone would favor not terminating J.R.'s parental rights. However, the circuit court was also aware that, at the time of the hearing, H.S. had been in foster

care and living with Allen for four years. She lives with her sister E.S. and three other children with whom she has a good relationship. Burgess-Garcia testified that Allen's home is safe and appropriate and poses no harm to H.S. In addition, H.S. has psychological issues which require treatment. She has been diagnosed with ADHD and is seeing a psychiatrist for aggressive behavior. Burgess-Garcia stated that Allen takes the children to all of their appointments and can safely manage all of H.S's needs. Allen testified that she desired to adopt H.S. H.S. was only one-year old when she was removed from J.R.'s custody and placed in foster care with Allen, and although J.R. consistently exercised his visitation rights and is bonded with H.S., according to Burgess-Garcia, the child's primary attachment is with Allen. Significantly, Burgess-Garcia was of the opinion that it is in H.S.'s best interest that she and E.S. remain together and testified that she did not believe that there was any way that both children would be placed with J.R. When all of the evidence before the court is considered, we believe that it is unlikely J.R. would be able to parent H.S.

¶ 34    When, as in this case, parental unfitness has been found, the rights of the parent must yield to the best interests of the child. *In re M.F.*, 326 Ill. App. 3d at 1115. The circuit court found that it is in H.S.'s best interest that J.R.'s parental rights be terminated and that a guardian be appointed with the right to consent to her adoption. Based upon the record before us, we are unable to conclude that the court's finding in this regard is against the manifest weight of the evidence, as an opposite conclusion is not clearly apparent.

¶ 35    Having found that neither the circuit court's finding that J.R. is unfit, nor its finding that it is in H.S's best interest that J.R's parental rights be terminated, is against the manifest weight of the evidence, we turn to S.S.'s appeal.

¶ 36    S.S. has not argued that the circuit court's finding of her unfitness as a parent of either H.S. or E.S. is against the manifest weight of the evidence.  Nor has she argued that the circuit court's finding that the termination of her parental rights is in the best interest of H.S. and E.S. is against the manifest weight of the evidence.  Therefore, the manifest weight issues have been forfeited.   See Ill. S. Ct. R. 341(h)(7) (eff. Jan. 1, 2016); *In re Rayshawn H.*, 2014 IL App (1st) 132178, ¶ 38.

¶ 37    In urging reversal of the court's orders terminating her parental rights as to H.S. and E.S., S.S. has raised a single argument; namely, that the record does not demonstrate compliance with the ICWA.  We agree.

¶ 38    The ICWA provides that "[i]n any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child, the Indian custodian of the child and the Indian child's tribe shall have a right to intervene at any point in the proceeding."  25 U.S.C. § 1911(c) (2012).  Obviously, the right to intervene would be meaningless without some form of notice.  *In re K.T.*, 2013 IL App (3d) 120969, ¶ 12.  Section 1912(a) of the ICWA provides for the required notice and states, in relevant part, that:

> "In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention. *** No foster care placement or termination of parental rights proceeding shall be held until at least ten days after receipt of notice by the parent or Indian custodian and the tribe ***."  25 U.S.C. § 1912(a) (2012).

The ICWA defines an Indian child as "any unmarried person who is under [the] age of eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4) (2012). S.S. told the court that she was descended from the "Cherokee, Creek, Blackfoot, Choctaw and Pawnee tribes."

¶ 39    If a child is subject to the ICWA, the termination proceeding is to be transferred to the tribal court on petition of either parent or the Indian child's tribe unless there is good cause to the contrary or the tribe declines. 25 U.S.C. § 1911(b) (2012). A violation of sections 1911 or 1912 of the ICWA may be cause to invalidate a state child custody proceeding. See 25 U.S.C. § 1914 (2012); *In re C.N.*, 196 Ill. 2d 181, 204 (2001).

¶ 40    The first issue to be resolved is whether the circuit court knew, or had reason to know, that H.S. and E.S. are Indian children within the meaning of the ICWA. As noted earlier, S.S. told the court on February 9, 2012, that she was a descendent of the following Indian tribes: "Cherokee, Creek, Blackfoot, Choctaw and Pawnee." We believe, therefore, that the proper course to have been taken at this early stage in the proceedings would have been for the circuit court to make a determination and enter findings regarding the status of H.S. and E.S. as either Indian children or non-Indian children. Absent a finding of fact by the circuit court in that regard, we must determine whether, at minimum, the circuit court had reason to know that H.S. and E.S. are Indian children.

¶ 41    In addition to S.S.'s assertions in response to the court's questions on February 9, 2012, the record contains a number of documents which were filed with the court indicating that S.S. is of Native American ancestry. In Recovery Coach Program court reports from the Treatment Alternatives for Safe Communities (TASC) organization which were filed with the court on June

- 18 -

27, 2013, November 5, 2013, and January 5, 2015, S.S.'s race is listed as "American Indian." The DCFS family service plans which were filed with the court on March 25, 2013, and November 5, 2013, state that S.S. reported Native American ancestry in her family of origin and that she was interested in Native American assistance.

¶ 42    The Guidelines for State Courts: Indian child custody proceedings, 44 Fed. Reg. 67586, B.1 (Nov. 26, 1979), state that the circumstances under which a state court has reason to believe that a child in a child custody proceedings is an Indian include when a party to the case informs the court that the child is an Indian child and when an officer of the court involved in the proceedings has knowledge that the child may be an Indian child.   Based upon the record before us, we believe that the circuit court had reason to know, that H.S. and E.S. may well be Indian children, triggering the notice requirements of section 1912(a) of the ICWA.

¶ 43    In this case, the circuit court found that the ICWA did not apply "based upon the notices and reports received from the various Indian tribes" that were made part of the record on October 1, 2015.  S.S. argues both that, by failing to provide copies of the notices sent to the various Indian tribes, the State failed to establish compliance with the ICWA, and that in addition, the State failed to establish that it sent notices to all of the Indian tribes that S.S. claimed to be a descendent of.

¶ 44    In support of her assertion that copies of the notices sent to the various Indian tribes must be included in the record to establish compliance with the ICWA, S.S. cites the Third District's opinion in *In re N.L.*, 2014 IL App (3d) 140172, ¶ 34.  The State and the Cook County Public Guardian on behalf of H.S. and E.S. rely upon the First District's decision in *In re F.O.*, 2014 IL App (1st) 140954, ¶ 52 in support of their argument that, when the record contains return receipts for the notices and responses from the tribes, copies of the notices themselves need not be filed

of record in order to establish compliance with the ICWA. However, we need not express our opinion as to which decision is the better reasoned, nor will we attempt to reconcile their seeming conflict, as there is no evidence contained in the record that an attempt was ever made to send notices to four of the tribes that S.S. claimed to be a descendent of; namely, the Blackfeet, Choctaw, Pawnee and Crete, which S.S. called Creek.

¶ 45    When the notice provisions of the ICWA are not complied with, the remedy is to reverse the circuit court's orders concerning foster placement of the child and termination of parental rights and remand the proceeding back to the circuit court to begin the proceedings anew in compliance with the requirements of the ICWA. *In re K.T.*, 2013 IL App (3d) 120969, ¶ 15. However, in this case, there has never been a finding that H.S and E.S. are, or are not, Indian children within the meaning of the ICWA. Consequently, we believe that the better course of action is to: vacate the circuit court's order of May 12, 2016, terminating the parental rights of S.S. and J.R. as to H.S. and appointing a guardian with the right to consent to her adoption; vacate the circuit court's order of May 12, 2016, terminating the parental rights of S.S. as to E.S. and appointing a guardian with the right to consent to her adoption; and remand both matters back to the circuit court with directions to make a factual determination of whether H.S. and E.S. are Indian children within the meaning of the IWCA. In the event that the circuit court on remand determines that H.S. and E.S. are not Indian children, the court is directed to reinstate the order terminating the parental rights of S.S. and J.R. as to H.S. and appointing a guardian with the right to consent to her adoption, and reinstate the order terminating parental rights of S.S. as to E.S. and appointing a guardian with the right to consent to her adoption. If, however, the circuit court determines that H.S. and E.S. are Indian children, the court shall begin proceedings as to both children anew in compliance with the ICWA.

¶ 46    Vacated and remanded with directions.