2020 IL App (1st) 200151
December 28, 2020

First Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* Z.L., N.L., S.L., and E.L. JR., | ) | Appeal from the |
| | ) | Circuit Court of |
| Minors | ) | Cook County. |
| | ) | |
| (The People of the State of Illinois, | ) | No. 18 JA 877 |
| Petitioner-Appellee, | ) | 18 JA 878 |
| v. | ) | 18 JA 879 |
| K.G., | ) | 18 JA 880 |
| Mother-Respondent-Appellant.) | ) | |
| | ) | Honorable |
| | ) | Demetrios Kottaras, |
| | ) | Judge Presiding. |

_____


PRESIDING JUSTICE WALKER delivered the judgment of the court, with opinion.
Justices Hyman and Pierce concurred in the judgment and opinion.

**OPINION**

¶ 1    The trial court made K.G.'s children wards of the court and found K.G. an unfit mother.

The parties agree that we must vacate the trial court's order and remand for notifications required

by the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1912(a) (2012)). K.G. argues that

the State also failed to prove her children suffered neglect. We agree with K.G. We vacate the trial court's order and remand for proceedings in accord with this order.

¶ 2                                    I. BACKGROUND

¶ 3     K.G. and E.L. Sr., had two sons: E.L. Jr., born October 1, 2005, and T.L., born December 23, 2006. T.L. died at five weeks of age in January 2007. The Department of Children and Family Services (DCFS) took custody of E.L. Jr., and he remained a ward of the court until March 30, 2010, when the Du Page County circuit court, over the objection of the State, terminated the wardship and ordered DCFS to close the case. The court's order left E.L. Jr. in the care of his parents.

¶ 4     K.G. and E.L. Sr. later had two daughters, S.L., born August 31, 2010, and N.L., born March 16, 2014. E.L. Jr., S.L., and N.L. flourished in their parents' care. On May 10, 2018, K.G. gave birth to the couple's third daughter, Z.L. Z.L. emerged at only 26 weeks of gestation and weighed less than a kilogram at birth. Z.L. remained in the hospital's intensive care unit for 19 days. Doctors diagnosed apnea, respiratory failure, bronchopulmonary dysplasia, anemia, hyponatremia, and retinopathy of both eyes, with most of the conditions closely related to Z.L.'s premature birth. The hospital discharged Z.L. to her parents' care on July 18, 2018.

¶ 5     On August 28, 2018, K.G. left the children in E.L. Sr.'s care when she went to a job interview. E.L. Sr. called K.G. and told her that Z.L. had stopped breathing after a feeding. E.L. Sr. had performed cardiopulmonary resuscitation, and Z.L. resumed breathing. E.L. Sr. later explained to a social worker that he did not immediately call for medical help because he and K.G. had been calling doctors about Z.L. "every day and were eventually instructed to stop calling." K.G. came home and took Z.L. to the office of her pediatrician, Dr. Manju Akhand, but K.G.

arrived after the office closed. Dr. Akhand advised K.G. to take Z.L. to the hospital if she needed immediate medical care. K.G. went to the hospital, but on seeing the long wait for emergency care and finding that Z.L. looked well, she went home. K.G. brought Z.L. to Dr. Akhand's office the next day. K.G. fed Z.L. in the office, and Z.L. projectile vomited. K.G., following Dr. Akhand's advice, took Z.L. to the emergency room of a nearby hospital.

¶ 6    Dr. Mary Jones examined Z.L. and concluded that abusive head trauma caused Z.L.'s condition. DCFS took custody of E.L. Jr., S.L., N.L., and Z.L. on September 6, 2018. The circuit court granted the State's motion for temporary custody of the four children on September 10, 2018. The State filed petitions to make the four children wards of the court.

¶ 7    At the trial on the petitions, Dr. Jones testified that Z.L.'s projectile vomiting suggested that she had suffered head trauma. Dr. Konrad Lebioda, a radiologist, reported to Dr. Jones that magnetic resonance imaging (MRI) taken on August 31, 2018, showed restricted diffusion in the corpus callosum and subdural hemorrhages. Dr. Jones listed several possible causes of the damage to the corpus callosum, and she ruled out most of them. She explained that she ruled out the possibility of a stroke:

> "[I]f there was a stroke, you would see more findings—I'm probably speaking above my level of expertise—so other than clinical symptoms that I would recognize as a pediatrician, I wouldn't want to go any further than saying symptoms.
>
> Q. But—so basically there would be other signs and symptoms?
>
> A. Yes."

¶ 8    Dr. Jones concluded that the damage to the corpus callosum resulted from "shaking or abusive head trauma." Dr. Jones testified, "The injuries that we often see in abusive head trauma are injuries to the ligaments or bleeding within the muscles of the neck," and Z.L. "didn't show any symptoms of a neck injury." Despite the lack of such symptoms, Dr. Jones concluded that Z.L. must have suffered abusive head trauma. She testified, "My conclusion's based on the findings of subdural hemorrhages; bilateral sub-arachnoid hemorrhage; the restricted diffusion on the MRI; the lack of any history of any injuries or trauma; and the differential diagnosis that I went through and was able to rule out all of the other potential causes." She added that hospitals teach parents of premature infants to call for emergency medical help whenever the child stops breathing.

¶ 9    Dr. Lebioda testified that in Z.L.'s MRI "the bright signal in diffusion-weighted imaging is what you typically see in a stroke. The size of it, the location of it are very typical for stroke." Despite the MRI, Dr. Lebioda concluded that abuse and not a stroke had caused the damage, because of the rarity of strokes in children so young and because of the subdural hemorrhages. He explained:

> "[T]he cause of subdural hemorrhaging is the tearing of very small, what we call, bridging veins that kind of go across that space. And when they [tear], they cause hemorrhage in the subdural space. So when you have trauma and tearing of those bridging veins, you have subdural hemorrhages."

¶ 10    Dr. Akhand testified that she found no signs of abuse or neglect of K.G.'s children. She noted the evidence of subdural hemorrhages and said, "Premature babies are prone to that because the blood vessels are immature, and they can break easily."

¶ 11    Dr. Joseph Scheller testified as an expert on behalf of K.G. He concluded that Z.L. suffered a small stroke. Like Dr. Jones, he did a differential diagnosis listing possible causes of the damage to the corpus callosum and then ruling out most of them as inconsistent with other medical evidence. He agreed with Dr. Jones about all the possibilities other than stroke and abuse. He found abuse very unlikely:

> "[N]o scalp injury, no skull injury ***. There were no broken bones. There was a set of x-rays done that looked carefully at the bones.
>
> No external injury. If a child has been beat up where are the bruises. And then finally, no neck injury. The MRI gave a—gave us a good look at the neck and we didn't see any neck injury.
>
> * * *
>
> [Z.L.] was checked for retinal hemorrhages and there weren't any."

¶ 12    The subdural hemorrhages did not justify a conclusion that Z.L. suffered abuse, according to Dr. Scheller.

> "[T]he medical record did show that [Z.L] had been vomiting. And when children vomit, they become dehydrated and their blood can become thicker than it should be an[d] cause a clot.
>
> And then the other possibility *** was that [Z.L.] had a congenital tendency that made her blood thicker than average and that's what caused it. And so that's a possibility because they never did the test for that."

Dr. Scheller concluded that a small stroke, and not abuse, caused Z.L.'s injuries.

¶ 13     No witness suggested that any event in the lifetimes of S.L., N.L., and Z.L. warned K.G. that she could not trust E.L. Sr. to take proper care of his children. No witness suggested that K.G. responded inappropriately to the crisis on August 28, 2018. To show that K.G. negligently endangered her children on August 28, 2018, the State argued that because of the death of T.L. in January 2007, when E.L. Sr. was taking care of T.L., K.G. should have known that leaving her children in the care of E.L. Sr. endangered the children.

¶ 14     In 2008, the Du Page County circuit court found that K.G. and E.L. Sr. neglected E.L. Jr. by subjecting him to an injurious environment. The court found that the death of T.L. from "non-accidental injuries" proved the environment injurious. On June 29, 2009, the Illinois Appellate Court for the Second District affirmed the circuit court's order, deferring to the circuit court's factual findings. But the appellate court noted:

> "The circumstances surrounding T.L.'s death are troubling. For instance, it is troubling that Dr. Webster determined T.L.'s cause of death to have stemmed from a blunt trauma to the liver given that T.L. did not have any external bruising surrounding the liver area. Given the severity of injuries to the left side of the head later attributed to abuse, it is odd that, while still at the hospital following his birth, T.L. did not pass the hearing test as to his left side and that, according to two defense experts, T.L.'s injury pattern on the left side of his head appeared consistent with the misapplication of forceps. Additionally, it is perplexing that respondents would make six separate doctors visits wherein they notified doctors of T.L.'s eye injury, which may have been related to his occipital fracture, and his rib injury, if they were the ones who had caused those injuries. Finally, assuming that T.L. was

abused over time, per the State's theory of the case, it is upsetting that none of these doctors suspected or reported that T.L. was being abused."

¶ 15    In 2010, the Du Page County Circuit Court restored full custody of E.L. Jr. to K.G. and E.L. Sr. A social worker noted that, according to K.G., an independent autopsy had shown no signs of abuse and that misapplication of forceps during delivery led to T.L.'s injuries. The State offered no other explanation for the Du Page court's 2010 ruling.

¶ 16    On the 2018 petitions for wardship, the trial court found Dr. Jones more persuasive than Dr. Scheller and, on that basis alone, held that the State proved that Z.L. was neglected by being subjected to an injurious environment. With no additional evidence concerning the other children, the court also found E.L. Jr., S.L., and N.L. neglected by being subjected to an injurious environment.

¶ 17    At the dispositional hearing, the caseworker testified that the children all want to return to K.G.'s custody. E.L. Sr. moved to Ohio by the date of the hearing and saw the children only under supervision of the foster parents. K.G. completed all the recommended services that DCFS had arranged. DCFS had recommended a parental capacity assessment, but it had not arranged for one by the date of the hearing. K.G. interacted appropriately with her children. E.L. Jr.'s grades and S.L.'s grades in school fell sharply in foster care. In October 2019, the school suspended E.L. Jr. for three days for cursing. The caseworker testified that E.L. Jr. "feels like he ha[s] to care for his siblings in his home because if [he does not] change diapers or get their food that it won't be done." The caseworker testified that E.L. Jr. showed signs that the foster care arrangement put him under severe stress. DCFS's report echoed the testimony: "[E.L. Jr.] self-disclosed that he feels that it is

his responsibility to assist in the parenting of his siblings. He is bonded and protective of his siblings."

¶ 18     The clinical social worker who provided individual therapy for K.G. reported successful termination of treatment.

> "Client has experienced significant improvement and gains throughout treatment. *** Goals established have been successfully completed: Parenting, grief and loss, communication/trust, family conflicts, exploring family relationships/conflicts; Demonstrate increased openness by sharing thoughts and feelings about family roles, dynamics, and expectations. Exploring past and current trauma. Reducing tension and conflict in the family by improvement of coping skills and communication. Freely expressing feelings of frustration, helplessness, and inadequacy experienced in parenting role. Lastly, verbalizing a sense of increased skill, effectiveness and confidence in parenting."

¶ 19     E.L. Sr. testified that his grandmother had Native American heritage, but he did not know to what tribe or nation she belonged. He only found out about the heritage after he moved to Ohio. E.L. Sr.'s mother, G.L., testified that her father's mother had Native American heritage, but she did not know the tribal affiliation. E.L. Sr.'s father testified that he also had Native American heritage, although he had not registered as a member of any tribe or nation. E.L. Sr.'s parents both promised to research further into their ancestry. At a subsequent hearing, E.L. told the court that his great aunt had Iroquois ancestors. E.L. Sr.'s parents continued to research to learn more about their Native American relatives.

¶ 20    The trial court found K.G. unable to care for her children. The court felt that DCFS should not have terminated K.G.'s individual therapy. The court said, "I question the completeness *** [of] individual therapy. I am not seeking admissions, I am not seeking confessions; however, I'm not satisfied." Despite K.G.'s successful completion of all services DCFS provided, the court found she had not done enough. The court appointed Janet Ahern of DCFS as guardian for the four children and made E.L. Jr., S.L., N.L., and Z.L. wards of the court. The court gave DCFS discretion to offer unsupervised visits and to review the placement, because the court was "concerned about E.L. Jr. and his grades as well as his one sister." K.G. now appeals.

¶ 21                                II. ANALYSIS

¶ 22    All parties agree that we must vacate the trial court's order and remand to the trial court for that court to send notice to the Bureau of Indian Affairs (BIA) and any Native American tribes or nations with potential relationships with the children. See *In re H.S.*, 2016 IL App (1st) 161589. If any tribe or nation seeks to intervene, the court must follow procedures established in the ICWA.

¶ 23    In *H.S.*, a parent similarly claimed Native American heritage, and no court had determined whether H.S. counted as an Indian child within the meaning of the ICWA. The *H.S.* court vacated the trial court's order concerning the placement of H.S. and remanded for statutory notice and for a determination of whether H.S. counted as an Indian child. If H.S. did not count as an Indian child, the *H.S.* court directed the trial court to reinstate its orders because the appellate court found no error other than the failure to notify the tribes or nations with possible interest in the case. *Id.* ¶ 45.

¶ 24    We apply the reasoning of *H.S.* We must decide what directions should accompany the order remanding the case for notice to the tribes or nations and the BIA. The State asks us to

instruct the trial court that, if no tribe or nation shows an interest in the case, the trial court should reinstate its original order. K.G. contends that we should reverse the finding of unfitness and direct the trial court to enter an order finding that the State failed to prove neglect.

¶ 25    "The term 'neglect' has generally been defined as the failure of a responsible adult to exercise the care that circumstances demand and encompasses both unintentional and willful disregard of parental duties. [Citation.] Cases involving an adjudication of neglect are *sui generis* and each case must ultimately be decided on the basis of its own particular facts." *In re Erin A.*, 2012 IL App (1st) 120050, ¶ 6. The State must prove neglect by a preponderance of the evidence. *Id.* ¶ 7. "A determination of neglect is within the discretion of the trial court and will not be disturbed on review unless it is against the manifest weight of the evidence." *Id.* ¶ 8.

¶ 26    The State presented no evidence concerning the parents' treatment of E.L. Jr., S.L., or N.L. For removal of E.L. Jr., S.L., and N.L. from K.G.'s care, the State relied exclusively on the doctrine of anticipatory neglect. "Under the anticipatory neglect theory, the State seeks to protect not only children who are the direct victims of neglect or abuse, but also those who have a probability to be subject to neglect or abuse because they reside, or in the future may reside, with an individual who has been found to have neglected or abused another child." *In re Arthur H.*, 212 Ill. 2d 441, 468 (2004). The neglect or abuse of one child constitutes evidence of the neglect of other minors in the respondent's care. *Id.* However, "there is no *per se* rule that neglect or abuse of one child conclusively establishes *** the neglect or abuse of another." *In re Harriett L.-B.*, 2016 IL App (1st) 152034, ¶ 21.

¶ 27    A court applying the theory of anticipatory neglect should

"consider the neglect or abuse inflicted on a sibling of the minor at issue in determining whether to impose a similar finding with respect to that minor. [Citation.] However, it is not so limited; that consideration is only a small one involved in a much bigger picture that must focus on the minor at issue. *** [W]hat is more key is the care and condition of the child in question, which is to be the central, and primary, focus." (Internal quotation marks omitted.) *Id.*

Neglect of a sibling "becomes incredibly less important than what is occurring with, and to, the specific minor in question." *In re Jordyn L.*, 2016 IL App (1st) 150956, ¶ 35. "[W]here the child is alleged to be neglected under the theory of anticipatory neglect, which concedes that the child has not been the victim of neglect or abuse, the court needs to evaluate the individual with whom the child will reside." *In re Zion M.*, 2015 IL App (1st) 151119, ¶ 34.

¶ 28    Here, because E.L. Sr. has moved to Ohio and he and K.G. have shown no intent to reunite, the court should look primarily to evidence concerning K.G.'s treatment of her children. Social workers testified that E.L. Jr., S.L., and N.L. all fared well in K.G.'s care. All grew up healthy, and E.L. Jr. and S.L. did reasonably well in school. Social workers testified that K.G. always interacted appropriately with her children, and her children consistently said they wanted to return to her care. The court found that K.G. neglected the children when she went for a job interview on August 28, 2018, and left the children in their father's care. The court found credible Dr. Jones's testimony that, by the time K.G. took Z.L. to see Dr. Akhand on August 29, 2018, Z.L. had suffered nonaccidental trauma of being shaken so severely she suffered a brain injury. The trial court did not find that K.G. herself shook Z.L. The State offered no evidence of any events within the decade

before Z.L.'s birth that should have alerted K.G. that she put her children at risk by leaving them in their father's care.

¶ 29　We find this case similar to *Zion M.*, 2015 IL App (1st) 151119. The trial court in *Zion M.* found that Zion's mother, Neatre, neglected Zion by allowing the father of her children to bring a gun into the house. The appellate court found:

> "There is nothing in the stipulated evidence to show that Neatre was aware that James Sr. had a gun or that he had brought one into the home. Although the public guardian argues that Neatre knew James Sr. had a gun and brought it into the home because one of Zion's siblings, Davion, made a statement that he had seen the gun before and that it belonged to his father, there is no evidence that Davion informed Neatre or anyone else about the presence of a gun. The public guardian invites us to speculate that since Davion may have known about the gun, Neatre must have known about the gun. *** Such speculation does not satisfy the preponderance of the evidence standard ***." *Id.* ¶ 35.

¶ 30　The *Zion M.* court emphasized that James Sr., who perpetrated the neglect and abuse of Zion's siblings, no longer lived with Neatre, and concluded that "the State failed to prove by a preponderance of evidence a case of anticipatory neglect." *Id.*

¶ 31　We also find guidance in *In re A.P.*, 2012 IL 113875. In *A.P.*, the State alleged that "both minors were neglected in that their environment was injurious to their welfare because respondent's boyfriend had burned A.P.'s face with hot water by other than accidental means." *Id.* ¶ 23. The trial court held that the State proved the children were neglected. Our supreme court

disagreed, rejecting the State's argument that the acts of McLee, the mother's boyfriend, proved that the mother neglected her children. The *A.P.* court said,

> "The State's reliance on *Arthur H.* for the proposition that under the [Juvenile Court Act of 1987] the State can obtain a finding of neglect due to a babysitter leaving a child unattended, resulting in injury, even without a showing of any knowledge by the parents that the babysitter was an unsuitable caregiver is misplaced. The State's interpretation of the [Juvenile Court Act of 1987] would, in essence, allow a finding of neglect due to an injurious environment *whenever* an injury to a minor could be attributed to improper supervision on the part of a selected caregiver, even in the case of the most conscientious parent who has exerted every reasonable effort in choosing a competent caregiver for his or her child. ***
>
> *** It was not respondent *** who was found to have left the children unsupervised at the time A.P. was injured but, rather, McLee. As this court has long held, neglect is generally defined as the failure to exercise the care that the circumstances justly demand ***. Under the circumstances in this case, it would not be possible to focus on the status of A.P. and J.P. *** and determine whether they had been neglected, without considering respondent's decision in choosing to have McLee babysit the minors. Simply put, in order to support the trial court's neglect findings in this case, there had to be some indication that respondent knew or should have known that McLee was an unsuitable caregiver. [Citation.]

> *** [R]espondent left the two children with McLee at his home while she went to a doctor's appointment. *** There was no indication that McLee could not provide a safe and nurturing shelter for respondent's children for the duration of the appointment. Similarly, there was no indication that the minors had previously been injured in McLee's presence, or that respondent had any reason to be concerned about him looking after the children. *** After A.P. was injured in this case, respondent immediately brought him to the emergency room ***. *** [T]he trial court's finding of neglect due to an injurious environment was against the manifest weight of the evidence in this case." (Emphasis in original.) *Id.* ¶¶ 24-26.

¶ 32 The State relies solely on the death of T.L. in 2007 as evidence that K.G. should have known she imperiled her children by leaving them in their father's care. But after the Du Page County court considered the evidence of the 2007 death, it returned E.L. Jr. to the unsupervised care of K.G. and E.L. Sr. In effect, the State tells us the Du Page County court negligently permitted neglectful parents K.G. and E.L. Sr. to endanger their children, because the Du Page County court, like K.G., knew that the death of T.L. proved E.L. Sr. endangered his children. The State demands that we find such neglect by the Du Page County court without even presenting to this court any account of the grounds for the Du Page County court's decision to terminate the wardship and order DCFS to close the case and return E.L. Jr. to his parents' care. By leaving K.G.'s account unopposed, the State gives us no grounds for rejecting her contention that a second autopsy of T.L. cleared her and E.L. Sr. of all allegations of wrongdoing in that case. On the record the State has presented, we cannot conclude that the death of T.L. in 2007 gave K.G. notice in August 2018 that she imperiled her children by leaving them in E.L. Sr.'s care for the time it took

her to go to a job interview. Because E.L. Sr. no longer resides with K.G., the evidence that he may have injured Z.L. does not show that K.G. neglected or abused her children. See *id.* ¶ 26. In accord with the reasoning of *A.P.* and *Zion M.*, we find that the State has not proven that the minors suffered neglect or abuse.

¶ 33 The record does, however, show that K.G.'s children have suffered from the order separating them from their mother. E.L. Jr., S.L., and N.L. were all growing up healthy, and the two in school were doing reasonably well in school before DCFS placed the children in a relative's foster home. The social worker noted that the change put considerable stress on E.L. Jr., who, at 13 years of age, tried to take care of his siblings because he felt "if [he does not] change diapers or get their food that it won't be done." His schoolwork and S.L.'s schoolwork suffered under the strain.

¶ 34                                PETITION FOR REHEARING

¶ 35 In a petition for rehearing the guardian *ad litem* attacks our ruling on several fronts. The State filed a separate brief that relies on the same arguments the guardian *ad litem* presented. First, the guardian contends that we should not have considered evidence introduced at the dispositional hearing in our review of the finding of neglect.

¶ 36 Neither the parties nor the guardian *ad litem* presented to the court at the adjudication hearing evidence that the children had all fared well under K.G.'s care prior to August 28, 2018. The guardian *ad litem* cites *In re Kenneth D.*, 364 Ill. App. 3d 797 (2006), in support. In *Kenneth D.*, the appellate court held that the trial court at the adjudication hearing did not need to consider evidence that the parents participated in services after the State took custody of their children, as the evidence lacked relevance to the question of whether conditions at the time the State took

custody warranted separating the children from their parents. *Id.* at 805-06. The evidence here concerns the condition of the children prior to the State's intervention. The evidence here bore particular relevance to the adjudication of whether K.G.'s children lived in an injurious environment. See *In re Sparrow*, 59 Ill. App. 3d 731, 738 (1978). Because of our duty to protect the children, we must not permit the failures of the guardian *ad litem* and counsel for the State and the parents to shackle our assessment of whether the evidence supports a finding of neglect and abuse. See *In re Tyrese J.*, 376 Ill. App. 3d 689, 703 (2007). We correctly considered all of the evidence relevant to the question of whether the children suffered from neglect and abuse.

¶ 37 After the State took custody of the children, but before the court entered a final judgment, E.L. Sr. moved out of the home he shared with K.G. "[A]n order finding a minor neglected and adjudicating wardship is not a final order." *In re Guzik*, 249 Ill. App. 3d 95, 99 (1993). "[C]ourts have the inherent power to amend and revise [interlocutory] orders at any time before final judgment." *Towns v. Yellow Cab Co.*, 73 Ill. 2d 113, 120-21 (1978). In the interest of the children, the trial court should have reconsidered its initial adjudication of neglect in light of the changed circumstances.

¶ 38 After E.L. Sr. left the home, the case became very similar to *In re A.P.*, 2012 IL 113875. In *A.P.*, as here, the circuit court found a single incident in which a child suffered physical harm due to neglect. In *A.P.*, as here, no evidence showed that the mother participated in the neglectful or abusive actions. In *A.P.*, as here, the court could find neglect and abuse only if it found the mother acted negligently by leaving the child in the care of the person who neglected or abused the children. The guardian *ad litem* emphasizes that the mother in *A.P.* left the children in the care of her boyfriend, not their father, but the guardian *ad litem* does not explain why that difference

should make any difference in the result. The evidence here, like the evidence in *A.P.*, does not show that the mother acted negligently when she left the children in the care of an adult whose subsequent neglect or abuse harmed a child. Thus, because E.L. Sr. separated from K.G. and will no longer take care of the children without supervision, the evidence here, like the evidence in *A.P.*, does not show neglect or abuse.

¶ 39    The guardian *ad litem* argues that the State did not solely rely on the theory of anticipatory neglect to show that K.G. exposed E.L. Jr., S.L., and N.L. to an injurious environment. The guardian *ad litem* cites *In re R.G.*, 2012 IL App (1st) 120193, as authority for the proposition that, without any evidence at all particular to E.L. Jr., S.L., and N.L., the State proved them neglected by proving that they lived in the same home with K.G. and Z.L.

¶ 40    Doctors found that R.G.'s brother, A.M., suffered numerous injuries over a period of several years while in the care of his parents. *Id.* ¶ 18. The numerous nonaccidental injuries proved the environment injurious for both children. *Id.* ¶¶ 46-50. Here, the State showed, at most, one nonaccidental injury. No expert testified that any injury must have occurred at some time other than August 28, 2018, when K.G. went to her job interview. No expert testified that E.L. Jr., S.L., or N.L. suffered any harm or had any reason to know of the injury to Z.L. The evidence of a single injury on a single occasion cannot support the inference that the children lived for years, or even for days, in an injurious environment. The evidence here, unlike the evidence in *R.G.*, does not support the inference that the mother willfully ignored evidence that her children lived in an injurious environment.

¶ 41    Finally, the guardian *ad litem* contends that the State proved that K.G. neglected Z.L.'s medical needs on August 28, 2018. The guardian *ad litem* argues that K.G. should have called 911

when she found out that E.L. Sr. had not called 911, but the guardian *ad litem* presented no evidence of what response the call would have provoked or how the call would have led to treatment other than advice to take Z.L. to her pediatrician or to a hospital emergency room. Because K.G. took the medical steps she would have taken if she had called 911, the lack of a call cannot amount to medical neglect.

¶ 42     No expert criticized K.G. for her actions following the call she received from E.L. Sr. She went home, took Z.L. to the pediatrician's office as quickly as she could, and, following the advice of the pediatrician, took Z.L. to an emergency room at a nearby hospital. At the hospital, she found a long wait, and she saw that Z.L. appeared well, so she decided to return home and take Z.L. to the pediatrician the next day. No expert criticized that decision. But in the opinion of the guardian *ad litem* and apparently of the trial court, the decision to leave the hospital with her apparently well baby warrants removing Z.L., E.L. Jr., S.L., and N.L. from K.G.'s care.

¶ 43     The court and the guardian *ad litem* do not explain what course of action K.G. could have taken to avoid the charge of neglect. By staying at the hospital, probably for hours (see William P. Qiao *et al.*, Relationship between Racial Disparities in ED Wait Times and Illness Severity, 34 Am. J. Emergency Med. 10-15 (2016); Christine Y. Park *et al.*, *Variation in Emergency Department Wait Times for Children by Race/Ethnicity and Payment Source*, 44 Health Servs. Research 2022-39 (2009), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2796312/ pdf/hesr0044-2022.pdf [https://perma.cc/F3ML-EZMH]), she would leave her other children in the care of E.L. Sr. for hours. But the court and the guardian *ad litem* contend that leaving any children in the care of E.L. Sr. constitutes neglect warranting removal of all children from K.G.'s care. The court and the guardian *ad litem* do not claim that K.G. must have, or could afford, a

babysitter—one the court would find trustworthy—available at all times. If K.G. took the time to assemble all her children and take them all to the hospital with her for the long wait, who would look after the children when an emergency room pediatrician finally found time to examine K.G.'s apparently well baby?

¶ 44 No expert faulted K.G. for taking Z.L. home when she saw that she would face a long wait time in the hospital. The evidence does not support a finding that K.G. neglected the medical needs of her children.

¶ 45 The General Assembly enacted the Juvenile Court Act of 1987 (705 ILCS 405/1-2(1) (West 2018)) to "secure for each minor subject hereto such care and guidance, preferably in his or her own home, as will serve the safety and moral, emotional, mental, and physical welfare of the minor and the best interests of the community; to preserve and strengthen the minor's family ties whenever possible, removing him or her from the custody of his or her parents only when his or her safety or welfare or the protection of the public cannot be adequately safeguarded without removal." If at any time prior to the entry of a final judgment the court encounters evidence showing it may not have needed to remove a child from the care of his or her parent, in accord with the court's duty to protect the child's interests, the court should reconsider its initial adjudication in light of the newly presented evidence. Here, the evidence that K.G.'s children fared well in her care prior to August 28, 2018, and never neglected the children, together with evidence that E.L. Sr. no longer lived with K.G., should have led the trial court to reconsider whether the State needed to retain custody of K.G.'s children. The evidence here does not justify removal of the children from K.G.'s care. We deny the State's and the guardian *ad litem*'s petitions for rehearing.

¶ 46    Finally, we note that the guardian *ad litem* has asked us to ignore relevant evidence of the care the children had received prior to removal and keep the children separated from their mother, despite the absence of evidence that she harmed the children and despite the repeated statements from the children that they wish to return to their mother's care. We do not understand how the guardian *ad litem* can believe that his actions served the interests of the children in this case.

¶ 47                                    III. CONCLUSION

¶ 48    We must vacate the trial court's order to permit proper notification to the BIA and to all Native American tribes and nations with a potential interest in the case, in accord with the ICWA. If no Native American tribe or nation seeks to intervene, the subsequent proceedings must be in accord with this order.

¶ 49    Vacated and remanded.

## No. 1-20-0151

| | |
|---|---|
| **Cite as:** | *In re Z.L.*, 2020 IL App (1st) 200151 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, Nos. 18-JA-877, 18-JA-878, 18-JA-879, 18-JA-880; the Hon. Demetrios Kottaras, Judge, presiding. |
| **Attorneys for Appellant:** | Amy P. Campanelli, Public Defender, of Chicago (Suzanne A. Isaacson, Assistant Public Defender, of counsel), for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Gina Divito and Victoria L. Kennedy, Assistant State's Attorneys, of counsel), for the People.<br><br>Charles P. Golbert, Public Guardian, of Chicago (Kass A. Plain, of counsel), guardian *ad litem*. |