2021 IL App (1st) 210978-U
Order filed December 30, 2021

FIRST DISTRICT
FOURTH DIVISION

No. 1-21-0978

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* V.J., a Minor, | ) | Appeal from the |
| | ) | Circuit Court of |
| Appellee, | ) | Cook County. |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | Nos. 17 JA 00460 |
| | ) | |
| v. | ) | |
| | ) | |
| Tracy J., | ) | Honorable |
| | ) | Shannon O'Malley, |
| Respondent-Appellant.) | ) | Judge, presiding. |

_____

JUSTICE ROCHFORD delivered the judgment of the court.
Justices Lampkin and Martin concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The orders finding the mother unfit to parent her minor daughter and terminating the mother's parental rights as to the daughter are affirmed where the court's findings of unfitness on the grounds of depravity, repeated incarceration, and failure to make reasonable progress were supported by the manifest weight of the evidence.

¶ 2    Defendant-appellant Tracy J. (the mother) appeals from orders of the circuit court, which determined that she was unfit to parent her daughter, V.J. and terminated the mother's parental rights. The circuit court's determination of unfitness was based on findings that the mother had

failed to maintain a reasonable degree of interest, concern, or responsibility as to V.J.'s welfare, subjected V.J. to extreme or repeated cruelty, failed to protect V.J. from an injurious environment, was depraved, failed to make progress in the nine-month period after adjudication, and was repeatedly incarcerated. On appeal, the mother argues that the circuit court erred in finding her unfit on several of the asserted grounds. We affirm.

¶ 3    On May 22, 2017, the State brought a petition for adjudication of wardship as to V.J., a minor who was born on November 11, 2011, against the mother and V.J.'s father Ronel H. (the father) and a motion for temporary custody. The petition contended that V.J. was neglected or abused pursuant to sections 405/2-3(1)(b) (injurious environment) and 405/2-3(2)(ii) (substantial risk of harm) of the Juvenile Court Act (Act) (705 ILCS 405/2-3(1)(b), 2-3(2)(ii) (West 2016)). In support, the State alleged that, on May 9, 2017, police were called to an apartment where the mother and her two children, V.J. and her younger brother J.J., were present. A strong odor of gas permeated the residence. The mother and the children were incoherent. The mother admitted to taking prescription medications in order to overdose and also giving the medications to the children. The mother told the police she no longer wanted to live. The mother was charged with attempted murder of the children and was in custody at the Cook County Jail (CCJ). The whereabouts of the father were unknown at that time.

¶ 4    The State supported the motion for temporary custody with the affidavit of Gwendoline Adams, an investigator for the Illinois Department of Children and Family Services (DCFS). Adams averred that the mother attempted to murder V.J. (then five years old) and J.J. (then two years old) by placing a bag over their heads, rope around their necks, and giving them smoothies and water, which contained medication. When found by the police, the children were incoherent, and the gas burners of the stove were turned on but there were no flames. The mother is

incarcerated, and the father has been absent from V.J.'s life. DCFS took protective custody of V.J. J.J. was placed in the care of his biological father; they are not parties to these proceedings.

¶ 5 The court granted the motion and placed V.J. in the temporary custody of DCFS after finding that probable cause existed that V.J. had been abused and neglected and there was an immediate and urgent necessity to remove her from the mother's care. The court appointed the office of the Cook County Public Guardian as V.J.'s attorney and guardian *ad litem* (GAL). The court would later appoint the office of the Cook County Public Defender to represent the mother.

¶ 6 The record on appeal includes May 9, 2017 records from St. Alexius Medical Center (St. Alexius) for the mother and V.J. According to the records, the mother was feeling overwhelmed and depressed and believed she was being exploited and disrespected by J.J.'s father. Her actions on May 9 were preceded by berating text messages from J.J.'s father. The mother reported two prior attempts at suicide. She was taking a high dose of Paxil, an antidepressant medication. During her stay at St. Alexis, the mother was diagnosed with major depression which was recurrent and severe but at that time was without psychotic symptoms. However, in the past, the mother had hallucinations and psychotic decompensation. It was recommended that she be placed in a psychiatric hospital.

¶ 7 V.J. was admitted to St Alexius through the emergency room after her exposure to natural gas and ingestion of medication. Upon arrival, V.J. was drowsy. During the hospital stay, V.J. "had one episode of bradycardia HR 50 with an unresponsiveness which resolved by Narcan IV." V.J. was discharged on May 11 and went home with her maternal aunt (the aunt) and maternal grandmother (the grandmother).

¶ 8 After several status hearings and case management conferences, the court scheduled an adjudication and a disposition hearing for May 17, 2018.

¶ 9    On that date, the October 10, 2017 integrated assessment report and November 16, 2017 DCFS family service plan were filed with the court.

¶ 10    The report described the incident, the mother's history, and the assessment as follows.

¶ 11    On May 9, the aunt and grandmother became concerned after receiving a disturbing text from the mother and requested that police conduct a well-being check. The police and (later the aunt and grandmother) went to the mother's home. Upon entry, the police found a large bag of pills and observed that the children had ropes around their necks but there were no noticeable ligature marks. The gas burners of the stove were on and there was a smell of gas. The mother and the children went in and out of consciousness. It was reported that the mother put crushed pills in smoothies for both children, milk for J.J. and water for V.J.

¶ 12    During her assessment interview, the mother related that she has suffered with symptoms of depression throughout her life and has a history of suicidal ideations. The mother has been treated for depression and has been prescribed antidepressants, including Paxil. She suffered from post-partum depression after the births of her children. In February 2015, she took medication in an attempt to commit suicide and was hospitalized for psychiatric treatment. Later that year, she was hospitalized again after acts of self-harm. After this second hospitalization, the mother failed to complete recommended therapy. Subsequently, the mother's primary care physician prescribed psychotropic medication. In early 2017, the mother began outpatient treatment and was taking Paxil. However, she was still feeling depressed and suicidal. While incarcerated at the CCJ, the mother began treatment with the CCJ's consulting psychiatrist and was taking medications. The mother maintained that her overall mental health had improved, and she was not having thoughts of self-harm.

¶ 13    Prior to the incident which gave rise to this case, the mother once put a pillow on the children's heads and pushed down. The mother told V.J. that she and J.J. were going to sleep for "180 years." V.J. kicked and cried in response and the mother passed out.

¶ 14    During her assessment, the mother expressed care and concern for the children and showed an understanding of their practical needs. She wants to be reunited with them and was willing to comply with any recommended services.

¶ 15    The report indicated that the mother's history of chronic mental illness prevented her from parenting the children on a consistent basis and placed the children in significant danger. Her symptoms of depression ("cycling in and out of good and bad days") impair her ability to meet the children's needs. She suffers from feelings of rejection and anxiety and appears to have a limited ability to cope with stress and change.

¶ 16    The prognosis for the mother to be reunified with V.J. was poor. For that goal to be achieved the mother would need intensive and long-term intervention to address her extensive mental health problems, stabilize her moods, and alleviate her suicidal and homicidal thoughts. The report's conclusion was that expedited termination of parental rights was in V.J.'s best interests.

¶ 17    The report recommended that the mother continue to comply with her psychiatrist's directions, take all prescribed psychotropic medicines, and participate in individual trauma-based therapy. No recommendation was made as to visitations in that there was a criminal court order prohibiting the mother from contact with V.J.

¶ 18    The plan was developed by staff at Lydia Home Association (LHA) which was monitoring the case on behalf of DCFS. The plan revealed that the mother remained in custody and was receiving psychiatric services and medication. The mother was not engaged in the recommended

services and could not have visitations with V.J. V.J. was living with her aunt. V.J. was doing well, attending kindergarten, and had completed therapy.

¶ 19  For purposes of the adjudication hearing, the parties entered into a stipulation as to the testimony of the grandmother, Hoffman Estate Police Officers Michael Barber and Jason Gessert, Hoffman Estates Detective Richard Truman, and DCFS Investigator Jennifer Fryman.

¶ 20  The grandmother would testify that on May 9, 2017, she received a concerning text from the mother who was upset about an argument with J.J.'s father. The grandmother and aunt tried unsuccessfully to reach the mother by phone. They drove to the mother's home and called the police. When the police gained entry into the home, there was a smell of gas, and the stove burners were on. V.J. told the grandmother that the mother put a rope around her neck, crushed pills into her drink, and told her to drink it.

¶ 21  Officer Michael Barber would testify that on May 9 he and Officer Gessert went to the mother's apartment and found the door partially opened. A smell of gas was coming from inside the apartment. The mother was lying on the floor behind an ottoman which barricaded the door. The mother went in and out of consciousness, mumbled and could not keep her eyes open. J.J. was stumbling back and forth and had a rope tied around his neck. J.J.'s eyes were glossy and rolling to the back of his head. V.J.'s legs buckled when she stood. The mother told the police that she took medications, and she did not want to live any more. In the kitchen, there were crushed pills "next to a brown shake or smoothie of some kind." The mother and minors were transported to St. Alexus.

¶ 22  Officer Barber overheard a conversation between the mother and the attending physician at St Alexius. The mother related that she was overwhelmed and wanted to end her life. She argued with J.J.'s father the night before. The mother did not want the children to go with J.J.'s father

when she died. She put a combination of the pills in a smoothie, but the children did not like the taste and would not drink it. She then put medications in water and made the children drink it. The mother put bags and ropes around the children's heads and placed them in bed with her. When one of the children became scared, she removed the bags and then fell asleep.

¶ 23     Officer Gessert would testify that after he and Officer Barber entered the mother's home, he found V.J. lying in a bed. She did not respond when he shouted at her. V.J. had clear fluid coming from her nose and mouth. He brought her to get fresh air. The officer saw pills in the kitchen; some pills were crushed.

¶ 24     Detective Truman interviewed the mother on May 10, 2017 at St Alexius. She was no longer under the influence of medication. During the interview, the mother informed the officer that on May 7, 2017, she sent J.J.'s father a text about his mental abuse and he sent a nasty text in return. Upon reading it, she became overwhelmed with emotions and said to herself. "God forgive me, but we need to be with [God]." She put medication (Clonazepan, Deazepam, Xanax, and Propanol) in a smoothie for herself and the children. The mother told the children that they were going to lay down on the floor, put bags on their heads and go to sleep. V.J. did not like the taste of the smoothie. The mother then had the children swallow a Xanax pill.

¶ 25     Ms. Fryman spoke to V.J. on May 10,2017, after being assigned as the investigator to this case. V.J. told her that the mother put a pill in a smoothie and forced her and J.J. to drink it. After doing so, V.J. was unable to walk. The mother told them they were going to take a nap on the floor. V.J. cried because she did not want to do that. A few days before this incident, the mother put a pillow over the children's faces and pushed down on the pillow so hard that V.J. began to cry.

¶ 26 Based on the stipulation as to the evidence, the circuit court entered an initial adjudication order finding that V.J. was abused and neglected on grounds of an injurious environment and substantial risk of physical injury. In a disposition order, the court found that the mother and the father were unable for some reason other than financial circumstances to care for V.J. and placed her in the guardianship of DCFS. In a permanency order, the court set a goal of return home pending status hearing.

¶ 27 On March 27, 2019, DCFS filed a permanency hearing report which attached a November 6, 2018 service plan. The report stated that the mother had made unsatisfactory progress toward the goal of return home. The mother was receiving individual counseling, group therapy, and medication while incarcerated but was not able to undergo the recommended services. Because of the no contact order in the criminal court, the mother had no visitations with V.J. The report included a recommendation that the goal be changed to guardianship; both the mother and the father agreed that guardianship was in the best interest of V.J. V.J. continued to live with the aunt and grandmother and had a strong relationship with both of them.

¶ 28 On that date, the circuit court entered a permanency order setting a goal of substitute care pending court determination of parental rights and finding this goal was in the best interest of V.J. In its order, the court noted that the case had been pending for close to two years, the mother was in custody and was prohibited from contacting V.J., and V.J. "deserved" permanency.

¶ 29 The State, on July 8, 2019, filed a supplemental petition for the appointment of a guardian with the right to consent to adoption, seeking to terminate the parental rights of the mother and the father and setting forth the basis of the mother's alleged unfitness under section 50/1D of the Adoption Act (750 ILCS 50/1(D) (West 2018)) and section 2-29 of the Act (705 ILCS 405/2-29) (West 2018)). The State claimed the mother was unfit in that she had failed to maintain a

reasonable degree of interest, concern, or responsibility as to V.J.'s welfare (750 ILCS 50/1(D)(b) and 705 ILCS 405/2-29) (ground b)); committed extreme or repeated cruelty as to V.J. (750 ILCS 50/1(D)(e) and 705 ILCS 405/2-29) (ground e)); failed to protect V.J. from conditions in V.J.'s environment which were injurious to her welfare (750 ILCS 50/1(D)(g) and 705 ILCS 405/2-29) (ground g)); behaved in a depraved manner (750 ILCS 50/1(D)(i) and 705 ILCS 405/2-29) (ground i)); failed to make reasonable efforts to correct the conditions which were the basis for V.J.'s removal and/or failed to make reasonable progress toward V.J.'s return within nine months after the adjudication of neglect or abuse under the Act or within any nine month period after said finding (750 ILCS 50/1(D)(m)(i), (ii) and 705 ILCS 405/2-29) (grounds m(i) and (ii))).

¶ 30    On December 5, 2019, DCFS filed a permanency hearing report which attached the October 28, 2019 family service plan. This permanency report indicated that the mother was unable to participate in recommended services as she was incarcerated. She continued to receive counseling, group therapy and medication while at the CCJ. The mother had not visited V.J. The aunt was providing a safe and loving environment for V.J. and is willing to adopt V.J. V.J. wishes to continue to live with the aunt and grandmother. The plan stated that V.J. was thriving with the aunt. The mother's CCJ mental health records revealed that the mother displays signs of major depression, low self-esteem, and anxiety and is prescribed three medications for mental health.

¶ 31    In the criminal proceedings, on July 27, 2020, the mother pled guilty to two counts of attempted murder as to the children and received a sentence of 11 years in prison. As a result, the mother was transferred to the Illinois Department of Corrections (IDOC) in October 2020.

¶ 32    On May 27, 2021, the father was in court and filed a written final and irrevocable consent to V.J.'s adoption by the aunt. After a hearing, the court found that the father had freely,

voluntarily, and without influence consented to V.J.'s adoption. As a result, his parental rights were later terminated. He is not a party to this appeal.

¶ 33    On that court date, the court held a permanency hearing. At the outset, without objection, the court admitted the April 26, 2021 service plan and a court report dated May 26, 2021.

¶ 34    Katerina Kanavos, the LHA caseworker assigned to V.J.'s case since October 2020, was called as a witness. She visited V.J. at the aunt's house just a few days before the hearing on May 24, 2021. V.J. (then nine years old) was doing well, was current in her medical appointments, had no medical needs, and was in third grade. The home was safe and there were no signs of abuse or neglect. The aunt was committed to adopting V.J. and V.J. expressed that she wished to continue to live with the aunt.

¶ 35    As to the mother, she was receiving limited services at the IDOC because of COVID-19 pandemic restrictions. The mother had no visitations with V.J. and DCFS/LHA staff had determined that phone contact with the mother would not be in V.J.'s best interest.

¶ 36    Kanavos recommended that the goal remain substitute care pending court determination of parental rights because V.J. is thriving with the aunt and is in a safe environment. The State and GAL agreed with this recommendation. The mother's attorney asked that DCFS/LHA be directed to reconsider its decision to deny the mother phone contact with V.J.

¶ 37    The court found that it was in the best interest of V.J. that the permanency goal of substitute care pending a determination of parental rights continue. Although the GAL stated that V.J. did not want phone contact with the mother, the court asked that the issue be reconsidered by DCFS/LHA.

¶ 38    The State, on June 7, 2021, filed a motion to amend the supplemental petition to add an allegation that the mother was unfit in that she has been repeatedly incarcerated which prevented

her from discharging her parental responsibilities (750 ILCS 50/1(D)(s) and 705 ILCS 405/2-29 (ground s)). After a hearing and over the mother's objection, the court granted the State leave to amend the supplemental petition.

¶ 39     The circuit court held a fitness hearing on July 12, 2021. At the hearing, the parties stipulated that the mother pled guilty to attempted murder of V.J. and was now incarcerated in the IDOC, with a projected release date of August 28, 2026.

¶ 40     As agreed by the parties, the following documents were admitted as evidence: the certified record of the mother's convictions for attempted murder of V.J. and J.J.; the integrated assessment dated October 10, 2017; the service plans dated June 20, 2017, October 10, 2017, November 6, 2017, May 24, 2018, November 4, 2018, and April 9, 2019; and two contact notes, dated May 10,2017 and May 11,2021.

¶ 41     The service plans revealed that the mother had not engaged in individual trauma-based therapy, had not participated in the Juvenile Court Assessment Program (JCAP), and had no visitations with V.J.

¶ 42     Kanavos testified that, as the case worker for this matter, she developed the November 2020 and May 2021 service plans and discussed them with the mother during administrative reviews over the phone. In both plans, the mother's compliance with the recommended services was found to be unsatisfactory. Kanavos could not verify that the mother was receiving services at the IDOC. DCFS does not provide services to individuals imprisoned within the IDOC.

¶ 43     The criminal court order prohibiting the mother from having contact with V.J. was lifted in October 2020. The mother requested a phone visit with V.J., but DCFS/LHA determined it was not in V.J.'s best interest in that it was unknown whether the mother was in treatment and

compliant with medications while at the IDOC. Later, when asked about a phone call with the mother. V.J. told the agency that she did not want one.

¶ 44    On cross-examination by the mother, Kanavos explained that in April 2021, she learned from the mother's counselor at the IDOC that services at the prison were "limited" during the pandemic. Kanavos did not ask which services were available and which were limited. According to the counselor, the mother would not sign the necessary consents to allow DCFS/LHA to obtain the mother's IDOC records and verify her services. The mother told the counselor that Kanavos had all the information she needed from her and the mother did not wish to speak with Kanavos. The mother had signed consents for her CCJ records.

¶ 45    Malva Waters, the foster care director at LHA, testified that she has supervised the case since its inception in May 2017. The mother's integrated assessment recommended certain mental health services and individual trauma-based therapy. The mother also was required to participate in a JCAP. As supervisor, Waters reviewed the service plans and determined whether she concurred with the recommendations. The mother never received an overall rating of satisfactory on any service plan. The JCAP has not been done. The mother did engage in psychiatric services and group and individual therapy at the CCJ, but those services did not meet the criteria of services which had been recommended to correct the conditions that gave rise to the case. The mother maintained that she continued to have psychiatric services at the IDOC, but without signed consent forms, her treatment could not be confirmed. Additionally, while her criminal case was pending, a court order prohibited the mother from having visits with V.J.

¶ 46    The court denied the mother's motion for a directed finding that the State had failed to meet its burden of proving any of the asserted grounds for unfitness. After the denial of the motion, the mother presented her case.

¶ 47    The court allowed the admission into evidence of the mother's CCJ therapy notes from July 2018 through May 2019 and from June 2019 through the end of 2019.

¶ 48    The mother testified that in August 2020, she received a birthday card that had been made and signed by V.J. In 2021, she received a Mother's Day card from V.J. which had a drawing of a cat and a heart and the word "mom." In return, the mother sent V.J. a letter.

¶ 49    In November 2020, during a case review meeting, the mother asked for visitation with V.J. After the meeting, the mother felt defeated because she was prevented from asking about visitation and there was nothing she could do.

¶ 50    In April 2021, the mother's counselor at the IDOC gave her a blank consent form. The consent form had no written indication that it was from Kanavos or LHA. She inquired of the counselor but was "unable to determine what it was for and who it was from." The counselor indicated that the mother was not required to sign the form but could do so if she wished. The mother "decided not to sign it, because [she] didn't know who it was from and what it was for." No one ever told her that to have a phone call with V.J., she would have to sign the consent form.

¶ 51    While at the CCJ, the mother attempted to call LHA, but she could not be connected. She later learned from a social worker that she could not make calls to outside agencies from the CCJ. She assumed the same would be true at the IDOC and so never attempted to call LHA from there. While at the CCJ, the mother would try to call the aunt at least once a month and managed to reach her "a handful of times." And she called the grandmother to learn how V.J. was doing.

¶ 52    At the IDOC, the mother speaks to a therapist at least once a month and each session lasts up to 30 minutes. Because of the pandemic, "[e]verything else has been closed." The mother and the therapist talk about her stressors and how she could keep herself busy. A psychiatrist prescribes

her medication. Her diagnosis is major depressive order with psychotic features and anxiety disorder. The mother is a member of the prison's residential council.

¶ 53    On cross-examination by the State, the mother testified that she did not remember trying to poison or choke V.J. and J.J.

¶ 54    The mother stated that before the pandemic restrictions, she met with LHA caseworkers in the courthouse after court calls. The caseworkers informed her that she was required to engage in the recommended services.

¶ 55    Kanavos testified in rebuttal that she sent the consent form to the mother's counselor at the IDOC. The consent form had been filled out with the mother's name, the information which LHA was seeking and the purpose of the request. Kanavos's practice was to send consent forms to an IDOC counselor in order to assure that the individual in custody receives the form and the counselor could answer any questions.

¶ 56    At the conclusion of the hearing, the court found the mother unfit, by clear and convincing evidence, on the grounds that the mother had failed to maintain a reasonable degree of interest, concern, or responsibility as to V.J.'s welfare (ground b); committed extreme or repeated cruelty (ground e); failed to protect V.J. from an injurious environment (ground g); was depraved (ground i); did not make progress in the nine-month period after adjudication (ground m(ii)); and was repeatedly incarcerated (ground s).

¶ 57    The circuit court proceeded to a best interest hearing.

¶ 58    The aunt testified that she has had custody of V.J. since May 2017. At that time, V.J. was 5; now she is 9. The grandmother also lives in the home, and helps care for V.J. The aunt loves V.J. and wishes to adopt her. V.J. is doing well in school and she and the aunt are involved in

activities. If she was permitted to adopt V.J., the aunt would allow "[a]ny form of contact [with the mother] that [V.J.] is comfortable with."

¶ 59    Kanavos testified that the foster home was safe and appropriate. V.J. said that "she's happy where she's at. She says that she likes living with her auntie and her granny." The aunt and V.J. are bonded.

¶ 60    Kanavos believed that termination of the mother's parental rights was in the best interest of V.J. The aunt wished to adopt V.J. and V.J. wanted to be with the aunt. The aunt was "a good parental figure in [V.J.'s] life right now."

¶ 61    The court ordered that the mother's parental rights be terminated and appointed the DCFS guardian administrator as V.J.'s guardians with the right to consent to adoption. The mother filed a timely appeal.

¶ 62    On appeal the mother argues that the court erred in finding that she was unfit to parent V.J. on the grounds of depravity (ground i), repeated incarceration (ground s), and failure to make reasonable progress (ground m(ii)). She acknowledges that this court may affirm the unfitness determination if only one of the findings is supported by clear and convincing evidence. The mother nonetheless asks that "in the interest of justice," the fitness and best interest orders be vacated and the matter be remanded for new fitness and best interest hearings because the errors "undermine the confidence in the outcome" of these proceedings.

¶ 63    The Act provides a "step-by-step" process for deciding whether a child should be removed from his or her parents, made a ward of the court, and whether parental rights should be terminated. *In re Arthur H.*, 212 Ill. 2d 441, 462 (2004). After a petition for wardship has been filed and a child has been placed in temporary custody, the circuit court first must determine whether a child is abused, neglected, or dependent, before it conducts an adjudication of wardship and dispositional

hearing. *Id.*; 705 ILCS 405/2-21(1), (2) (West 2018). The dispositional hearing and ruling on wardship give "the parents 'fair notice of what they must do to retain their rights to their child' in the face of any future termination proceedings." *In re J.B.*, 2018 IL App (1st) 173096, ¶ 26 (quoting *In re April C.*, 326 Ill. App. 3d 225, 237 (2001)).

¶ 64    Parental rights may be involuntarily terminated where: (1) the State proves that a parent is unfit pursuant to one of the grounds set forth in section 50/1(D) of the Adoption Act and (2) the trial court finds that termination is in the child's best interest. *In re M.R.*, 393 Ill. App. 609, 613 (2009); 705 ILCS 405/1-1 *et seq.* (West 2018). The State bears the burden of proving by clear and convincing evidence that a parent is unfit under a ground contained in section 50/1(D) of the Adoption Act. *In re D.F.*, 201 Ill. 2d 476, 494-95 (2002). Any single ground, properly established, is sufficient for a finding of unfitness. *Id.* at 495. "Because the circuit court is in the best position to assess the credibility of witnesses, a reviewing court may reverse a finding of unfitness only where it is against the manifest weight of the evidence. A finding is against the manifest weight of the evidence where the opposite conclusion is clearly evident." (Internal citations omitted) *In re Deandre P.*, 405 Ill. App. 3d 945, 952 (2010). A reviewing court may not substitute its judgment for that of the circuit court regarding the credibility of witnesses, the proper weight to be accorded the evidence, or the inferences to be drawn therefrom. *D.F.*, 201 Ill. 2d at 499.

¶ 65    On appeal, the mother does not challenge the findings of unfitness on grounds b, e, and g. Additionally, she does not raise error in the court's finding that the termination of her parental rights as to V.J. was in V.J.'s best interest. The mother has forfeited any claims of error as to these issues. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020); see also *In re H.S.*, 2016 IL App (1st) 161589, ¶ 36 (failure to challenge the unfitness finding results in forfeiture of that issue on appeal). Based

on the mother's forfeiture, we may affirm the determinations that the mother was unfit to parent V.J. and that termination of the mother's parental rights is in the best interest of V.J.

¶ 66    However, the mother argues that the alleged errors as to the findings of unfitness on grounds i, s, and m(ii) require that we reverse the orders finding her unfit and terminating her parental rights. The GAL and the State respond that these findings are supported by the manifest weight of the evidence and for this reason we will consider the mother's arguments.

¶ 67    The mother first argues that the finding of depravity, ground i, was in error.

¶ 68    The Adoption Act provides that depravity is a ground for a finding of parental unfitness and that a conviction for attempted first degree or second degree murder of a child "creates a presumption that a parent is depraved which can be overcome only by clear and convincing evidence." 750 ILCS 50/1(D)(i). Once the certified copy of a conviction for attempted first degree or second degree murder of a child is entered into evidence, a finding of unfitness would be justified unless the parent overcomes the presumption of depravity by clear and convincing evidence. See *In re Donald A.G.*, 221 Ill. 2d 234, 239, 252 (2006). If the parent presents sufficient evidence to rebut the presumption, the presumption is removed and the issue of depravity is determined based on the presented evidence. *In re L.J.S.*, 2018 IL App (3d) 180218, ¶ 18 (citing *In re J.A.*, 316 Ill. App. 3d 553, 562 (2000)).

¶ 69    The certified record of the mother's convictions for attempted murder of the children gave rise to a presumption of the mother's depravity which could be rebutted only by clear and convincing evidence. The mother contends that the circuit court ignored the evidence in the record, which showed that "[t]he mother did not lead a life of crime or had pursued an advanced education, participated in treatment and has the potential for rehabilitation." The mother further argues that

the convictions "resulted from mental illness rather than being a depraved person generally." We disagree with the mother.

¶ 70    A parent may rebut the presumption of depravity by showing they have been rehabilitated. See *In re Shanna W.*, 343 Ill. App. 3d 1155, 1167 (2003). The focus of the rehabilitation is on the parent's actions and history after the conviction. *Id.*

¶ 71    The mother pled guilty and was convicted of attempted murder of the children who were of very young ages. She attempted the murders by feeding her medication to the children in different forms. The mother put bags over the children's heads and tied the bags with ropes around their necks. The burners of the stove were on at the time with no flames and gas permeated the apartment. While the mother has serious mental health issues, she presented no evidence in rebuttal to show what role her mental illness played in the attempted murders of the children. The mother, on cross-examination, maintained that she did not remember her attempts to murder the children. Her testimony lacked any showing of remorse for her criminal and harmful behavior.

¶ 72    Based on her assessment it was determined that the mother would need to complete intensive treatment to achieve reunification. While incarcerated at the CCJ, the mother did participate in treatment but never fulfilled the recommended individual trauma-based therapy or the JCAP. More directly relevant to the issue of rehabilitation and ground s, after her convictions, the mother refused to sign the consent forms for the release of her IDOC treatment records and her treatment there has not been verified. As a result, LHA determined that the mother would not be allowed to have phone visitations with V.J.

¶ 73    Throughout these proceedings, when V.J. was a child and needed her, the mother has been incarcerated. The mother is projected to be released from the IDOC in August 2026, over four

years from now. At that point, it will be over nine years since V.J. was taken from the mother's custody and V.J. will be almost 15 years old.

¶ 74    We conclude that the mother has not overcome the presumption of depravity by clear and convincing evidence and even if the presumption had been rebutted, the evidence which was adduced at the fitness hearing sufficiently established the ground s finding. We hold that the finding of depravity was supported by the manifest weight of the evidence. See *Shanna W.*, 343 Ill. App. 3d at 1167 (where court stated that rehabilitation "can only be shown by a parent who leaves prison and maintains a lifestyle suitable for parenting children safely."); *In re T.S.*, 312 Ill. App. 3d 875, 878 (2003) (father had not overcome presumption of depravity when he continued to commit crimes and his children needed him).

¶ 75    Next the mother maintains that the finding of unfitness on ground s was in error as she was incarcerated only one time and section 50/1D(s) of the Adoption Act requires repeated incarcerations.

¶ 76    Under Section 50/1D(s), a parent may be found unfit due to repeated incarceration if:

> "The child is in the temporary custody or guardianship of the [DCFS], the parent is incarcerated at the time the petition or motion for termination of parental rights is filed, the parent has been repeatedly incarcerated as a result of criminal convictions, and the parent's repeated incarceration has prevented the parent from discharging his or her parental responsibilities for the child." 750 ILCS 50/1D(s).

¶ 77    There is no disagreement that the mother was incarcerated at the time the petition for termination of parental rights was filed. The mother's position is that the circuit court's ground s finding is contrary to the "repeatedly incarcerated as a result of criminal convictions" language of section 50/1(D)(s). We disagree.

¶ 78    Section 50/1(D)(s) applies when the parent's repeated "incarceration" prevents them from discharging their parental responsibilities; the statute uses the singular form of incarceration. Our Supreme Court in *In re D.D.*, found that "the legislature's use of the singular form to be both deliberate and significant." 196 Ill. 2d 405, 420 (2001). The Supreme Court explained:

> "The singular term *** has a broader connotation. By using the singular form, stating 'the parent's *repeated incarceration* has prevented the parent from discharging his or her parental responsibilities for the child,' the legislature makes reference to the general inclusive concept of 'repeated incarceration,' suggesting that courts may consider the overall impact that repeated incarceration may have on the parent's ability to discharge his or her parental responsibilities—circumstances which may flow from the fact of repeated incarceration, such as the diminished capacity to provide financial, physical, and emotional support for the child." *Id.* at 420-21 (Emphasis in original).

In other words, "the overall impact of repeated incarceration is the touchstone of section 1(D)(s)." *In re Gwynne P.*, 215 Ill. 2d 340, 358 (2005) (citing *In re D.D.*, 196 Ill. 2d at 420-21). Further, "only one incarceration is necessary for a finding of unfitness under subsection 1(D)(s) if the court finds the parent was prevented from discharging his responsibilities." *In re E.C.*, 337 Ill. App. 3d 391, 399 (citing *In re D.D.*, 196 Ill. 2d at 420-22).

¶ 79    The mother's repeated incarceration for her attempted murder convictions has prevented her from fulfilling her parental responsibilities for V.J. and from caring for V.J.'s needs as a young child. Her incarceration has hindered her from obtaining the required services and having contact with V.J. The finding that the mother was unfit on ground s is not against the manifest weight of the evidence.

¶ 80    The mother's final argument is that the circuit court's finding as to ground m(ii) that the mother failed to make reasonable progress within the nine-month period following the adjudication of abuse and neglect (May 2018 to February 2019) is against the manifest weight of the evidence. Again, we disagree with the mother.

¶ 81    Under section 1(D)(m)(ii) of the Adoption Act a parent's failure to make "reasonable progress" toward the return of their child during any nine-month period after an adjudication of neglect or abuse supports a finding of parental unfitness. 750 ILCS 50/1(D)(m)(ii). Courts are to consider evidence occurring only during the nine-month period at issue. *In re J.L.*, 236 Ill. 2d 329, 341 (2010). "Reasonable progress toward the return of the child is judged on an objective standard that focuses on the steps the parent has taken toward reunification." *H.S.*, 2016 IL App (1st) 161589, ¶ 27 (citing *D.F.*, 332 Ill. App. 3d at 125). At a minimum, parents must make "measurable or demonstrable movement toward reunification." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1067 (2006)). "Reasonable progress exists when a trial court can conclude that it will be able to order the child returned to parental custody in the near future." *Id.* Courts may consider the extent of a parent's compliance with service plans and regularity of visitations with the minor. *In re Je. A.*, 2019 IL App (1st) 190467, ¶ 63.

¶ 82    During the entire nine-month period following the hearing in May 2018, the mother was in custody. The service plans during this period revealed that the mother had not engaged in individual trauma-based therapy, had not participated in the JCAP, and had no visitations with V.J. Although the mother participated in individual counseling, group therapy, and was taking medication while at the CCJ, Waters testified that these treatments did not meet the criteria of the services which had been recommended to achieve the mother's reunification with T.J. The mother

was prohibited from having any contact with T.J. and as a result there were no visitations of any kind.

¶ 83    The mother acknowledged that she did not comply with the service plans, as the required services were not available to her in the jail. She argues that had the services been available, she would have engaged in them.

¶ 84    A parent's incarceration is not evidence of the parent's failure to make reasonable progress but can impede progress toward the goal of reunification. *Je. A.*, 2019 IL App (1st) 190467, ¶ 72. Our Supreme Court has held that the time incarcerated does not toll the nine-month period in which the parent must make reasonable progress. *J.L.*, 236 Ill. 2d 329, at 341-342.

¶ 85    Here, the mother failed to take steps to complete the recommended services and was not allowed visitations with T.J. The mother was impeded by her incarceration and the evidence demonstrated that she failed to make reasonable progress toward the return of V.J. In summary, there was no evidence to support a conclusion by the circuit court that V.J. was close to being reunited with the mother in the "near future." See *Je. A.*, 2019 IL App (1st) 190467, ¶ 68 (citing *In re Jacorey S.*, 2012 IL App (1st) 113427, ¶21). The finding that the mother was unfit on ground m(ii) is not against the manifest weight of the evidence.

¶ 86    The mother has failed to establish that the circuit court erred in finding her unfit as to grounds i, s, and m(ii). Thus, there is no reason to consider her argument that she is entitled to new fitness and best interest hearings in order to achieve justice in this case. We do note, however, that the mother failed to cite any authority that would support her request.

¶ 87    For the foregoing reasons, the court's orders finding the mother, T.J., unfit, and terminating her parental rights are affirmed.