2024 IL App (1st) 231409-U
Order filed March 21, 2024

FIRST DISTRICT
FOURTH DIVISION

No. 1-23-1409

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* M.M., a Minor, | ) | Appeal from the |
| | ) | Circuit Court of |
| Appellee, | ) | Cook County. |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | No. 18 JA 540 |
| | ) | |
| v. | ) | |
| | ) | |
| Harielle E., | ) | Honorable |
| | ) | Kimberly D. Lewis, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

PRESIDING JUSTICE ROCHFORD delivered the judgment of the court.
Justices Martin and Ocasio concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We affirm the finding of the trial court that the mother was unfit to parent her child over her arguments that the court considered inadmissible evidence and her counsel was ineffective at the fitness hearing for failing to object to the inadmissible evidence and seek to reopen proofs. We also affirm the finding that it was in the child's best interest that the mother's parental rights be terminated.

¶ 2    Respondent-appellant, Harielle E., (the mother) appeals from the trial court's July 10, 2023 order finding her unfit as a parent under sections 1(D)(b) and (m) of the Adoption Act (grounds b

and m) (750 ILCS 50/1(D)(b), (m) (West 2022)) and pursuant to section 2-29 of the Juvenile Court Act of 1987 (705 ILCS 405/2-29 (West 2022)) and terminating her parental rights as to her minor daughter, M.M. We affirm.

¶ 3     M.M. was born on June 6, 2018 to the mother and Antoine M. (the father)[1] and taken into custody by the Department of Children and Family Services (DCFS) two days later. The parents also have an older daughter, Me.M., (born on June 7, 2017) and two younger sons, Mar.M. (born on August 21, 2019) and Mat.M. (born in late 2020)[2] (together siblings or children). M.M. and Mar.M. reside in the same non-relative foster home with Vinnie M. (the foster parent). Me.M. and Mat. M. live in a relative foster home with the maternal grandfather, Harrelle E. (the grandfather). Parental rights regarding the siblings are not at issue on appeal.

¶ 4     On June 11, 2018, the State filed a petition for adjudication of wardship of M.M., based on the prior abuse of Me.M., against the mother and the father, contending that M.M. was neglected pursuant to section 2-3(1)(b) [injurious environment] and abused pursuant to section 2-3(2)(ii) [substantial risk of physical injury] of the Juvenile Court Act (705 ILCS 405/2-3(1)(b), 2(ii) (West 2018)), and a motion for temporary custody. As to the petition and the motion, the State alleged:

> "Putative father has one prior indicated report for medical neglect and bone fractures by abuse. Parents have one other minor[, Me.M.,] who is in DCFS temporary custody with findings of abuse, neglect and physical abuse having been entered. Offered and recommended reunification services are outstanding for both parents at this time. Parents reside together and paternity has not been established."

---

[1] The father is not a party to this appeal. On September 27, 2018, the trial court entered a paternity order finding that he was the biological father of M.M. On December 14, 2022, the father was defaulted for want of appearance/answer.

[2] Based on the record, Mat.M. was born in either October or November 2020.

The State supported these factual allegations with the affidavit of a DCFS investigator who also averred that the mother was still in a relationship and lived with the father, who was indicated in the prior investigation as to Me.M. The investigator further stated that the mother had not completed required services as to Me.M.'s case and her "[i]nvolvement with child in care[, Me.M.] inconsistent."

¶ 5    That day, the trial court entered orders granting temporary custody of M.M. to DCFS and appointing her a guardian *ad litem* (GAL). DCFS placed M.M. in the foster parent's home. The court entered an order allowing the mother and the father supervised day visits. Ada S. McKinley Community Services (McKinley) was assigned to monitor the family on behalf of DCFS.

¶ 6    On July 17, 2018, the trial court entered an order which stated that the father agreed to comply with an emergency order of protection (EOP) issued on July 10, 2018 in case number 18 OP 75267 and prohibited him from having contact with the mother, Me.M., and M.M. In her petition for the EOP, the mother alleged that on July 8, 2018: "[The father] was very irritable and upset at me. We were arguing the entire day and he made numerous threats to hit me and beat me up. I didn't feel safe being with him and I was afraid he would seriously hurt me this day." The mother asked the court "to make [the father] get help with his mental health issues and help him become a better person."

¶ 7    On the court date of September 27, 2018, the State presented exhibits which are part of the record including: a September 24, 2017 prior report history as to Me.M. stating "indicated for allegation #9 bone fractures and #79 medical neglect;" the July 10, 2018 EOP; and a three-page stipulation of facts dated May 24, 2018, which was filed in the case involving Me.M.

¶ 8    The stipulation of facts provided as follows. The father was custodial of Me.M. at the relevant times. The mother spent about "50% of the time at the residence where the father resides

with [Me.M.]." On September 24, 2017, after taking Me.M. to the park with the father, the mother noticed that Me.M.'s "leg was discolored, her foot was swollen and she was not extending her left leg." They brought her to the hospital. The father said that Me.M. fell out of her carrier at the park and landed on the concrete on her left hip. The father had no explanation for Me.M.'s healing broken ribs. The mother did not know how Me.M. was injured.

¶ 9    Dr. Kirsten Simonton, an expert in the field of pediatrics and child abuse pediatrics, described Me.M.'s injuries as: "subacute healing fractures of the left first, second, and third metatarsals, an acute oblique left femoral fracture, a healing right posterior seventh and eighth rib fractures, a possible subconjunctival hemorrhage in the medial aspect of left eye, a bruise under the minor's right eye, multiple hyper pigmented lesions, and a periosteal reaction along the right femur." The doctor's opinion was that the "presence of acute and healing fractures in [Me.M.] are consistent with non-accidental trauma."

¶ 10    That same day, based in part on the stipulation of facts, the trial court entered an adjudication order finding that M.M. had been neglected pursuant to section 2-3(1)(b) [injurious environment] and abused pursuant to section 2-3(2)(ii) [substantial risk of physical injury] of the Juvenile Court Act (705 ILCS 405/2-3(1)(b), 2(ii) (West 2018)). The trial court found that the abuse was inflicted by a parent.

¶ 11    The trial court also entered a disposition order adjudicating M.M. a ward of the court and finding that the mother and the father were unable for some reason other than financial circumstances alone to care for, protect, train, or discipline M.M. The trial court found that it was in the best interest of M.M. to remove her from the custody of the mother and the father. Temporary custody was terminated and M.M. was placed in the guardianship of DCFS. The court entered a permanency order setting a goal of return home within 12 months.

¶ 12    On October 30, 2018, an October 29, 2018 quarterly report, prepared by the mother's then therapist, was entered into the common law record. The therapist noted that the mother lacked the ability to properly gauge potentially harmful environments. The therapist going forward hoped to work with the mother on how she could process information, take responsibility for her actions, and understand the father's actions lead to this case. According to the report, the mother remained in a relationship with the father and showed signs of wanting to continue the relationship. The mother "must be able to adequately advocate for the safety of her children and self-protect." The therapist recommended continued participation in therapy and frequent supervised visitations.

¶ 13    A February 15, 2019 permanency order set a goal of return home within nine months. The mother's quarterly therapist report revealed that she had attended 30 of 52 possible sessions, did not acknowledge the father's wrongdoing as to Me.M., refuses to discuss the domestic violence in her relationship with the father, had begun a graphic design business with the father and understands that her therapy progression must improve to achieve reunification.

¶ 14    On June 5, 2019, the trial court ordered that the mother's unsupervised visits with M.M. could not commence until the mother made progress in treatment and had negative urine screens. On August 7, 2019, the trial court entered an additional order on visits, stating that visits would remain supervised, as the mother "is inconsistent with drug treatment but is consistent with domestic violence and therapy." The court also entered a permanency order with a goal of return home within 12 months.

¶ 15    On October 8, 2020, the trial court set a goal of substitute care pending court determination on termination of parental rights. In the order the court found that the required services were appropriate and were still ongoing.

¶ 16     On June 9, 2021, the State filed a supplemental petition for the appointment of a guardian with the right to consent to adoption. The State alleged that the parents were unfit under 750 ILCS 50/1(D) (b) and (m) (West 2020) and 705 ILCS 405/2-29 (West 2020) and that it was in the best interest of M.M. that their parental rights be terminated. The State further alleged that it was in the best interest of M.M. that a guardian be appointed with the right to consent to adoption as M.M. had resided with the foster parent since June 11, 2018 and the foster parent wanted to adopt her.

¶ 17     On December 14, 2022, the trial court entered a case management conference order listing more than 12 witnesses and identifying the following as exhibits: any and all documents contained in the agency file, integrated assessments, and service plans. The order directed the State to tender all exhibits 14 days prior to trial on April 26, 2023.

¶ 18     The State filed a pleading specifying the following six nine-month periods for lack of substantial progress under ground m: September 28, 2018 to June 28, 2019; June 28, 2019 to March 28, 2020; March 28 to December 28, 2020; December 28, 2020 to September 28, 2021; September 28, 2021 to June 28, 2022; and/or June 28, 2022 to March 28, 2023.

¶ 19     On April 26, 2023, the trial court held a fitness hearing. The fitness hearing involved both M.M. and Me.M., however, we will address only those facts pertinent to M.M.

¶ 20     The State called the only witness, Sarah Al-Hassan, a caseworker with McKinley. Prior to her testimony, the court, at the request of the State, took judicial notice that M.M.'s adjudication took place on September 27, 2018 and she was made a ward of the court on September 29, 2018[3].

¶ 21     The State then sought to admit several exhibits: a 2017 integrated assessment (IA); a 2018 IA; service plans dated October 2017, March and September 2018, March and September 2019,

___

[3] This date appears to be in error, as the disposition order adjudicating M.M. a ward of the court was dated September 27, 2018.

September 2020; March and September 2021, March and September 2022. The trial court admitted all 12 exhibits into evidence, without objection.

¶ 22 The 2017 IA was performed for Me.M.'s case. The mother was recommended to participate in individual therapy, the nurturing parenting program, and supervised visits.

¶ 23 The 2018 IA was performed after the commencement of M.M.'s case. This assessment report explained that the mother had limited insight into the severity of Me.M.'s injuries and little empathy as to their continued impact. The screener opined that the mother's minimization and denial presented a risk for M.M. and Me.M. as the mother may struggle to identify and assess their safety. The screener further opined that for reunification with M.M. to occur, the mother needed to demonstrate the ability to provide a safe and emotionally nurturing environment and be attuned to M.M.'s needs.

¶ 24 Additionally, the 2018 IA noted that M.M. was placed in a traditional foster home on June 11, 2018. The screener believed that a secure attachment would help M.M. develop the capacity for self-regulation of affect through interactions with someone distinctly interested in her. Further, it would be important for M.M.'s development and social-emotional health for her to achieve permanency quickly. The screener recommended regular visitation to aid in reunification.

¶ 25 The October 2017 and March 2018 service plans were created for Me.M. prior to M.M.'s birth.

¶ 26 The September 2018 service plan noted that the mother reported to the foster parent that the father "had jumped on her," in early July. The agency referred the mother and the father to domestic violence classes. The parents were not consistently visiting.

¶ 27 The March 2019 service plan revealed that mother had "recently dropped positive." Although the mother participated in an initial domestic violence assessment, she refused the

recommended services. The mother's overall progress was rated unsatisfactory; she was not attending therapy and her visits were sporadic.

¶ 28    The September 2019 service plan stated that the mother's visits remained sporadic. The mother was recommended to reengage in intensive outpatient substance abuse treatment. She had not allowed the agency to complete a child endangerment risk assessment protocol (CERAP) of her home. The mother was participating in individual therapy and domestic violence therapy.

¶ 29    Al Hassan was the caseworker for the September 2020, March and September 2021, and March and September 2022 service plans.

¶ 30    The September 2020 service plan noted that the mother was not engaging with her substance abuse treatment coach, had not completed the recommended random urinalysis, and was likely to be discharged from substance abuse treatment due to a lack of engagement for over 30 days. The agency continued to have concerns regarding domestic violence. During a visit with the children, the mother wore sunglasses the entire visit, explaining that she woke up with a swollen eye. The mother still had not allowed the agency to conduct a CERAP at her residence, which was "critical for return home." The mother was referred to individual therapy and was assigned a therapist, but refused to complete the intake. The mother started an intensive outpatient substance abuse treatment in May 2019, but was discharged for nonattendance in September 2019. The mother completed domestic violence services. As of September 17, 2020, the mother was rated unsatisfactory on progress toward the permanency goal of return home.

¶ 31    According to the March 2021 service plan, both parents had random urinalyses that came back positive. The mother was referred for a substance abuse assessment. Both parents had been referred for, but refused, a mental health screening. The mother still had not allowed the agency to conduct a CERAP of her home. She had not complied with weekly visitation for six months.

¶ 32    The September 2021 service plan, provided that the mother had been referred to another agency for individual therapy, which had not yet begun. The mother allowed the agency to conduct a CERAP of her home. The mother needed to re-engage in substance abuse treatment. As of September 8, 2021, the mother still needed to complete substance abuse therapy, and was rated unsatisfactory for substance abuse treatment, although she reported willingness to re-engage.

¶ 33    The March 2022 service plan noted that the mother had progressed in some reunification services and that the agency would refer her for outpatient substance abuse treatment given her inconsistent participation in required random urinalysis.

¶ 34    The September 2022 service plan concluded that the mother remained in need of substance abuse treatment. The mother had completed individual therapy. The agency was waiting for reports from the therapist.

¶ 35    Al-Hassan testified that she was assigned to M.M. and Me.M.'s cases in September 2020. Al-Hassan is also the caseworker for the two other children of the mother and the father; their cases came into the system after M.M. and Me.M.'s cases. Until sometime in 2022, the mother continued to be in a relationship with the father. There is a history of domestic violence between the mother and the father.

¶ 36    In September 2018, an integrated assessment was completed for the mother, which recommended that she participate in individual therapy, a nurturing parenting program, child-parent psychotherapy, domestic violence classes, and substance abuse treatment. At the time of the hearing, the mother was not engaged in any services. In 2022, Al-Hassan referred the mother to individual therapy, which she completed for the first time in June or July 2022. The mother had not been previously engaged in individual therapy while Al-Hassan was assigned to the case. The

mother was then referred to intensive outpatient drug treatment, which she completed in September 2022. The mother completed parenting classes in 2019.

¶ 37    Al-Hassan's supervisor referred the mother to domestic violence services after it was reported that the mother was being abused. During one of the visits with the children, the mother was wearing sunglasses "to cover the abuse." The mother had not admitted to the abuse. Al-Hassan thought the mother completed those services in 2019. Al-Hassan's supervisor also made referrals for parenting classes, which the mother completed.

¶ 38    Al-Hassan did not have contact with the mother from the end of 2020 through 2021. The mother did not visit with the children in 2021. The agency did diligent searches to locate the mother and found an address for her. The agency sent letters in an attempt to reach her and Al-Hassan went to the address herself. The mother never responded to the communications. The mother reestablished contact with the agency in 2022 by phone. The mother explained her absence by telling Al-Hassan that she had a lot going on in 2021. The mother said she was attending school for graphic design and was willing to complete services. She then reported to Al-Hassan that she was no longer in a relationship with the father.

¶ 39    Before the permanency goal was changed in 2020, the mother had been allowed supervised visitations with the minors four times a month, but she only visited twice a month. Prior to the goal change, the agency had recommended unsupervised visits, but those did not occur as the mother would not provide the agency with an address to complete a CERAP. The mother said she was not ready to give an address. In 2022, when the mother resumed contact, she provided an address and the agency completed a CERAP. At the time of the hearing, the mother was allowed two supervised visits a month with M.M., but she was only visiting once a month.

¶ 40    On cross-examination by the GAL, Al-Hassan testified that the mother no longer resides in the home where the agency completed the CERAP. The mother has not provided the agency with her latest address and gave as the reason that she is living with a friend. The agency has not been able to conduct a CERAP of her current home. The mother said, when she found a new apartment, she would provide that address.

¶ 41    On cross-examination by the mother, Al-Hassan testified that the mother has been visiting with M.M. and Me.M. since the beginning of 2022 and those visits have been appropriate. There are no outstanding services for the mother.

¶ 42    In closing argument, the State and the GAL requested findings of unfitness on grounds b and m. The State reminded the court that Me.M. had suffered physical abuse and the court had found that her injuries were non-accidental. The State highlighted the testimony of Al-Hassan and the service plan of September 17, 2020 and argued that the mother failed to comply with all of the service requirements until 2022, lost contact with the agency in 2021, and continued to have a relationship with the father until 2022.

¶ 43    The trial court orally found the mother unfit to parent under grounds b and m. As to ground b, the court found that the mother "had a slow start" in services and after being missing in 2021, engaged in services. The court noted, however,

> "it's not just again a matter from time to time someone showing that kind of effort, concern, as a child's life doesn't just stop and wait for people to decide when they want to engage years later while the child is getting attached to another household. That's why it has to be fluid and consistent.
>
> So because it was not, the Court does find the State has met its burden of proof of clear and convincing evidence for unfitness for [the mother], that she failed to maintain a

- 11 -

reasonable degree of concern, interest, or responsibility to the child's welfare throughout the pendency of this case. It was not consistent."

¶ 44　As to ground m, the court found that the State had shown by clear and convincing evidence that the mother failed to make the necessary efforts to correct the conditions which were the basis of M.M. being placed with DCFS and failed to make reasonable progress in all of the nine-month periods pled by the State.

¶ 45　The court proceeded to a best interest hearing for both Me.M. and M.M. The court took judicial notice of the findings from the fitness hearing.

¶ 46　The State called the grandfather as the first witness. He testified that Me.M. has lived with him since December 2017. His wife and three of his children also live in the home; the mother does not live with him. When asked whether he wanted to adopt Me.M., the grandfather responded "I don't know. I think I would rather say something about the other piece of that. I think we're missing stuff." The grandfather, unprompted, went into discussing whether the mother was missing during 2021. She was not missing because she had been visiting his home. Specifically, he stated that it was "absolutely correct" that she missed some time, but "to be missing the whole '21, I know exactly where she was living. I can show you the dates when she was at my house." The grandfather further testified that the mother " was at my house visiting and talking to [Al-Hassan], I can show you messages where [Al-Hassan] had told me I talked to your daughter asking me— 2021, when she's saying she's missing, that didn't happen."

¶ 47　The trial court then asked the grandfather whether he desired to adopt Me.M. "because that was actually the question." He responded that he was not sure and that Al-Hassan was "giving you all the wrong information to push toward adoption." The court responded: "For year 2021. But the case has been pending for four years."

¶ 48    At that time, the State requested a continuance so that a family and team meeting could take place. The court continued the best interest hearing to July 10, 2023. On the following court date, the State informed the trial court that after a family and team meeting , it had been determined that a different permanency goal would be pursued for Me.M. With the agreement of the parties, Me.M.'s matter was continued for a permanency hearing for later in July.

¶ 49    Thereafter, the trial court proceeded with a best interest hearing for M.M. only.

¶ 50    The court took judicial notice of the evidence and findings from the fitness hearing. The court heard testimony from Al-Hassan and the foster parent.

¶ 51    Al-Hassan testified that M.M., five years old, has been placed with the foster parent since her case came into the system in 2018. The agency recommended that the foster parent adopt M.M.

¶ 52    Al-Hassan visits the foster home frequently and has found the home to be safe and appropriate, with no signs of abuse or neglect. M.M. has never voiced any concerns about residing with the foster parent.

¶ 53    M.M. is attached and well bonded to the foster parent; their interactions are like those of a mother and a daughter. M.M. calls the foster parent "mommy." Mar.M., two other foster children, and two of the foster parent's biological children, also reside in the home. Al-Hassan observed that they all interact "like a family." M.M. is connected with the foster parent's extended family.

¶ 54    M.M. does not have special needs and has not been recommended to participate in services. M.M. is in pre-kindergarten and is doing well. M.M. has visits, supervised by Al-Hassan, with the mother once a month at the foster parent's home. There have been no concerns or issues with the visitations.

¶ 55    The foster parent testified that she loves and wishes to adopt M.M. M.M. was five days old when she began living in the foster home. M.M. has bonded with the foster parent's extended

family. M.M. is friendly, outgoing, and very smart. She does well in school, participates in cheerleading and loves to be outside, particularly the park. The foster parent will continue M.M.'s visits with the mother and the siblings should there be an adoption.

¶ 56    After hearing the evidence, the court orally found that it was in M.M.'s best interest that the mother's parental rights be terminated and that the goal should be an adoption. Additionally, the trial court entered a written termination order finding that the mother was unfit under grounds b and m and that it was in the best interest of M.M. to terminate the mother's parental rights and a permanency order setting a permanency goal of adoption.

¶ 57    After taking judicial notice of the evidence and findings from the termination of parental rights hearing, the court found that the permanency goal of adoption was in M.M.'s best interest and entered a permanency order setting a permanency goal of adoption.

¶ 58    The mother appealed.

¶ 59    The Juvenile Court Act provides a two-step process to involuntarily terminate a parent's rights. *In re M.I.*, 2016 IL 120232, ¶ 20. First, the State must prove that a parent is unfit pursuant to one of the grounds set forth in section 1(D) of the Adoption Act. 705 ILCS 405/2-29(2) (West 2022); 750 ILCS 50/1(D) (West 2022). After a court finds a parent unfit, it determines whether it is in the minor's best interest to terminate that parent's rights. 705 ILCS 405/2-29(2) (West 2022).

¶ 60    The State bears the burden of proving by clear and convincing evidence that a parent is unfit under a ground contained in section 1(D) of the Adoption Act. *In re D.F.*, 201 Ill. 2d 476, 494-95 (2002). Any single ground, properly established, is sufficient for a finding of unfitness. *Id.* at 495. "Because the [trial] court is in the best position to assess the credibility of witnesses, a reviewing court may reverse a finding of unfitness only where it is against the manifest weight of the evidence. [Citation.] A finding is against the manifest weight of the evidence where the

opposite conclusion is clearly evident. [Citation.]" *In re Deandre P.*, 405 Ill. App. 3d 945, 952 (2010). A reviewing court may not substitute its judgment for that of the trial court regarding credibility of witnesses, the proper weight to be accorded the evidence, or the inferences to be drawn therefrom. *D.F.*, 201 Ill. 2d at 499.

¶ 61    The trial court found the mother unfit under grounds b and m. 750 ILCS 50/1D(b) and (m) (West 2020). The mother argues that, based on only the admissible evidence, those findings were against the manifest weight of the evidence. The mother's position is that the State's exhibits failed to comply with 705 ILCS 405/2-18(4)(a) (West 2020) and constituted inadmissible hearsay. Additionally, the mother argues that the trial court erred in not reopening the proofs regarding fitness after the grandfather's testimony at the best interest hearing. The mother acknowledges that these issues were not properly preserved for appeal, where her trial counsel failed to object to the admission of the exhibits and did not seek to reopen the proofs, but argues that we should review these issues under ineffectiveness of counsel or in the alternative under plain error.

¶ 62    We will focus our review on ground m, and more specifically ground m(ii). Section 1(D)(m) of the Adoption Act, provides two grounds for which a parent can be found to be unfit: "a parent's failure to make 'reasonable efforts' to correct the conditions that were the basis for the removal of the child, and a parent's failure to make 'reasonable progress' toward the return of the child" during any nine-month period after an adjudication of neglect or abuse. *In re H.S.*, 2016 IL App (1st) 161589, ¶ 24 (citing 750 ILCS 50/1(D)(m)(i), (ii)).Unfitness under ground (m)(ii), failure to make reasonable progress toward the return of the child is judged on an objective standard, focusing on the steps the parent has taken toward reunification. *Id.* ¶ 27 (citing *In re D.F.*, 332 Ill. App. 3d 112, 125 (2002)). Reasonable progress is made if the court can conclude that it will be able to order the minor returned to parental custody in the near future. *In re Daphine E.*,

368 Ill. App. 3d 1052, 1067 (2006). At a minimum, the parent must make demonstrable movement toward the goal of returning the child home. *In re J.A.*, 2019 IL App (1st) 190467, ¶ 62. Assessment of a parent's progress toward reunification should be confined to the nine-month periods set forth by the State. *Id.* ¶ 63. "It is well established that a failure to comply with an imposed service plan and infrequent or irregular visitation with the [minor] may support a finding of unfitness under sections (b) and (m)." *In re Jeanette L.*, 2017 IL App (1st) 161944, ¶ 18.

¶ 63    The trial court adjudicated M.M. as abused or neglected on September 27, 2018. After the fitness hearing, the court in its termination orders found that the mother was unfit under ground (m)(ii) for failure to make reasonable progress during the nine-month periods after the adjudication orders which were alleged by the State. We will limit our review to the nine-month period of March 28 to December 28, 2020; and in doing so consider only the evidence from this time period. *In re J.L.*, 236 Ill. 2d 329, 341 (2010). If the manifest weight of the evidence supports a finding that the mother did not make reasonable progress during this period, we may affirm the court's finding as to ground m. *D.F.*, 201 Ill. 2d at 495. We may also affirm the finding of unfitness without reviewing the other grounds. See *M.I.*, 2016 IL 120232, ¶ 43.

¶ 64    As previously stated, in challenging the finding that she was unfit, the mother first argues that the trial court erred in admitting the State's exhibits, two integrated assessments and ten service plans, and cites section 2-18(4) of the Juvenile Court Act (705 ILCS 405/2-18(4) (West 2022)) and *In re M.H.*, 2020 IL App (3d) 190731, in support of this argument. The exhibits were admitted without objection and the mother did not raise the issue in a post hearing motion. The mother acknowledges that this argument has been forfeited. *Id.*, ¶ 15 (citing *In the Matter of Chance H.*, 2019 IL App 1st 180053 ¶ 45). She asks that we consider the issue under either plain error or ineffectiveness of counsel.

¶ 65    Section 2-18(4) allows the admission of business records in hearings under the Juvenile Court Act where "the statutory foundational requirements are met." *M.H.*, 2020 IL App (3d) 190731, ¶ 16. The statutory requirements for the admission of the State's exhibits were not met here as the State did not present testimony to lay a foundation for their admission and the court did not find that the exhibits were "made in the regular course of the business of the hospital or agency and that it was in the regular course of such business to make it, at the time of the act, transaction, occurrence or event, or within a reasonable time thereafter." 705 ILCS 405/2-18(4)(a) (West 2022). None of the exhibits included a certification asserting that the exhibit satisfied the conditions of section 2-18(4) as a way of meeting the foundational requirements.

¶ 66    In *In re M.H.*, the parents objected to the testimony of a caseworker at a fitness hearing which was based on records which had not been admitted into evidence. 2020 IL App (3d) 190731, ¶ 7. The court allowed the State a continuance to obtain the records and to share them with the parents. *Id.* ¶ 10. On the next court date, the State sought the admission of three service plans. *Id.* ¶ 11. The attorney for the parents objected on the grounds that he had not previously seen the service plans and for lack of foundation. *Id.* The court overruled the objection and allowed the service plans into evidence. *Id.* The appellate court considered the issue under plain error "since the termination of parental rights affects a fundamental liberty interest." *Id.* ¶ 15 (citing *In re L.B.*, 2015 IL App (3d) 150023, ¶ 11). The court found that the service plans were admitted in error in violation of section 2-18(4) in that the State did not elicit testimony from the caseworker to lay the required foundation and the plans did not include any certifications. *M.H.*, 2020 IL App (3d) 190731 ¶ 18.

¶ 67    The court in *In re M.H.* noted that a remand would not be necessary if there was other evidence to support at least one ground of unfitness. *Id.* ¶ 21. However, in that case the

caseworker's testimony was "gleaned from reading from the case file." *Id.* ¶ 19. Under section 2-18(4), " 'it is the business record itself, not the testimony of a witness who makes reference to the record, which is admissible.' " *Id.* ¶ 19. The court concluded that the caseworker's testimony based merely on a "reading of the case file" was admitted in error and the State offered no other evidence in support of the finding of unfitness. *Id.* ¶ 20.

¶ 68     A forfeited issue may be reviewed under the plain error doctrine when: (1) a clear or obvious error occurs and the evidence is so closely balanced that such error threatens to tip the scales of justice against the accused, regardless of the seriousness of the error or (2) a clear or obvious error occurs and the error is so serious that it affects the fairness of the trial and challenges the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Piatkowski*, 225 Ill.2d 551, 565 (2007).

¶ 69     The State and the GAL argue that plain error does not apply here because the mother invited the error by acquiescing to the admission of the exhibits. Under the rule of invited error, a party may not complain of error when that party induced or consented to the error. *People v McGuire*, 2017 IL App (4th) 150695, ¶ 29. At the outset of the hearing, the State sought the admission of the exhibits into evidence and identified each exhibit. The court in admitting all of the exhibits stated that there was no objection and the mother remained silent. She never voiced an objection throughout the fitness hearing.

¶ 70     Where, as here, a party's counsel has acquiesced to the action taken by the court, plain error is not available to review a forfeited issue, the only available recourse for that party is to claim ineffectiveness of counsel. *Id*. We turn to the mother's ineffectiveness of counsel argument.

¶ 71     A parent has a statutory right to counsel in a proceeding to terminate his or her parental rights. 705 ILCS 405/1-5(1) (West 2016); *In re Ca. B*, 2019 IL App (1st) 181024, ¶ 41. We apply

the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), in reviewing a parent's claim of ineffective assistance of counsel in a proceeding to terminate parental rights. *Ca. B*, 2019 IL App (1st) 181024, ¶ 42. Under *Strickland*, a parent must show that counsel's performance fell below an objective standard of reasonableness and that, but for the error, a reasonable probability exists that the result of the proceeding would have been different. *Id.* (citing *Strickland*, 466 U.S. at 687-88). Failure to satisfy either prong precludes a finding of ineffective assistance of counsel. *Id.*

¶ 72     We may dispose of the mother's ineffectiveness claim on the prejudice prong. As to this prong, we first observe that had counsel for the mother objected to the admission of the exhibits, the State could easily have laid the foundation for their admission, particularly as to the service plans where Al-Hassan was the caseworker. She was present at the hearing and already scheduled to testify. Thus, an objection would not likely have resulted in the exclusion of these service plans.

¶ 73     Second, as we discussed above, the appellate court found in *In re M.H.*, an error in the admission of evidence at the fitness hearing does not require a remand where there is evidence to sufficiently support a ground of unfitness. The State offered the testimony of Al-Hassan who served as the family's caseworker during the nine-month period under review. The mother does not challenge the admissibility of the testimony of Al-Hassan at the fitness hearing, Instead, she acknowledges, in her reply brief, that the testimony was "correctly admitted." We will consider whether the unchallenged evidence supports a finding of unfitness under ground m(ii) for the nine-month period of March 28 to December 28, 2020.

¶ 74     During the time period of March 28 to December 28, 2020, the court found in an order entered on August 14, 2020 that DCFS had made reasonable efforts in providing the mother with services to achieve the then goal of return home. However, on October 8, 2020, the court entered

an order changing the goal to substitute care pending determination on termination of parental rights. In its order the court noted that the required services were appropriate but that the mother's services were still ongoing. At that point, M.M.'s case had been pending for over two years.

¶ 75    Al-Hassan's testimony confirmed that at the beginning of the case, the mother was found to need certain services. These services were required so that the mother could achieve reunification and address the reasons for M.M. being in the care of DCFS: the significant physical abuse suffered by Me.M. The mother's individual therapy and intensive outpatient drug treatment were still outstanding during this time period. Al-Hassan testified that in fact the mother did not complete these required services until 2022, two years after this time period and four years after M.M.'s case began.

¶ 76    During this nine-month period, the mother was allowed only supervised visits with M.M. and she did not fully participate in those visitations. The mother was allowed four supervised visitations a month but attended only two visits per month. The mother had the opportunity to achieve unsupervised visitations but failed to provide an address so that the agency could conduct a CEARP to assure her home was safe. M.M. was two years old during this period and the mother had never had unsupervised visits with her.

¶ 77    Further, during this time period, Al-Hassan testified that the mother was still in a relationship with the father. In fact, their fourth child was born during this nine-month period. And the mother continued her relationship with the father even though the father was connected to the many and significant injuries suffered by Me.M. when she was only two months old. His wrongful and harmful conduct was the reason for M.M. and her three siblings being removed from the mother's care and placed under the supervision of DCFS.

¶ 78    The testimony of Al-Hassan demonstrated the mother's lack of progress in services which

were meant to achieve reunification with M.M. The testimony showed the mother's lack of care and concern for M.M. as she was inconsistent with supervised visits and never obtained unsupervised visits. The mother refused to give the agency her address so that a CEARP could be conducted to determine if her home was safe for unsupervised visits. She continued in her relationship with the father who had been indicated for the serious injuries to Me.M. when she was an infant.

¶ 79    The testimony of Al-Hassan supports the finding that the mother was unfit under ground m(ii) for the nine-month period of March 28 to December 28, 2020. We affirm the finding of unfitness as not against the manifest weight of the evidence. As a result, the mother has failed to show that there was a reasonable probability that the result of the fitness hearing would have been different had her counsel objected to the admission of the exhibits.

¶ 80    The mother further argues that her counsel was ineffective for failure to seek to reopen the proofs of the fitness hearing after the grandfather's testimony at the best interest hearing that the mother did not disappear in 2021. In the alternative, the mother argues that it was plain error for the trial court to fail to *sua sponte* re-open the proofs of the fitness hearing based on the grandfather's testimony. Because the relevance of this testimony would fall outside of the time period under our review, the mother cannot establish that error occurred. See *Chance H.*, 2019 IL App (1st) 180053, ¶ 48 ("The first step in conducting plain error review *** is to determine whether error occurred at all."). She further cannot establish prejudice and fails to satisfy the second prong of the *Strickland* analysis. We conclude that the arguments relating to reopening the proofs at the fitness hearing are without merit.

¶ 81    In summary, we reject the mother's claims of plain error and ineffectiveness of counsel as to the fitness hearing, conclude that the trial court's finding that the mother was unfit under ground

m(ii) for the nine-month period of March 28 to December 28, 2020 was not against the manifest weight of the evidence, and affirm the finding of unfitness. Because we affirm the trial court's finding under this ground, we need not consider the court's unfitness findings under the other grounds. See *M.I.*, 2016 IL 120232, ¶ 43. Because the mother does not raise challenges to the best interest hearing, we affirm the trial court's finding that the termination of her parental rights was in M.M.'s best interest and the order terminating the mother's parental rights. See *In re Y.F.*, 2023 IL App (1st) 221216 (limiting review to the fitness findings where the mother did not challenge the court's finding that it was in the best interest of the minor that the mother's parental rights be terminated).

¶ 82    For the foregoing reasons, we affirm the trial court's judgment.

¶ 83    Affirmed.